

**Signed and Filed: July 20, 2019**

**DENNIS MONTALI**
**U.S. Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
for the Northern District of California

# UNITED STATES BANKRUPTCY COURT

# NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| In re: | Case No. 17-30501 |
| BRUGNARA PROPERTIES VI | Ch. 7 |
| Debtor. | |
| BRUGNARA PROPERTIES VI | A.P. No. 17-3071 |
| Plaintiff, | |
| v. | |
| INTERNAL REVENUE SERVICE, et al | |
| Defendants. | |

## MEMORANDUM DECISION ON MOTIONS FOR SUMMARY JUDGMENT

Plaintiff and Debtor Brugnara Properties VI ("Debtor") filed a motion for summary judgment in the above-captioned adversary proceeding. The Internal Revenue Service ("IRS") and the California Franchise Tax Board ("FTB," and together, the "Taxing Authorities") filed competing motions for summary judgment. The matters came on for argument on April 25, 2019, and thereafter were submitted. As explained below, Debtor's motion for summary

-1-

1   judgment is DENIED, and the Taxing Authorities' motions for summary judgment are

2   GRANTED on two alternate theories: alter ego and nominee.

3

4   **I. INTRODUCTION**

5   **Procedural Background**

6       This bankruptcy case originated as a chapter 11 and was converted to chapter 7 on April

7   3, 2018. While in chapter 11, Debtor acted as debtor in possession until Janina M. Hoskins was

8   appointed chapter 11 trustee. Following conversion, Ms. Hoskins was again appointed trustee.

9   Debtor filed this adversary proceeding on October 23, 2017, seeking a determination that the

10   Taxing Authorities do not have valid nominee liens on Debtor's property located on Sea Cliff

11   Avenue in San Francisco, California ("Sea Cliff").

12       The court relies principally on evidence jointly submitted by the Taxing Authorities.

13   The facts below are not materially disputed and are corroborated by supporting documentation.

14   Debtor has proffered little to no admissible evidence to rebut them or raise any material

15   disputes as to their veracity. Consequently, the Joint Statement of Facts (dkt. 68) is

16   incorporated into this decision and attached as Exhibit A.[1]

17       In summary, Debtor was created in April 2000, with Luke[2] Brugnara ("Luke") as its

18   sole officer, director, and shareholder. In July 2002, one of his entities, Brugnara Properties V,

19   purchased Sea Cliff from a third party. In October 2002, Brugnara Properties V transferred Sea

20   Cliff to Debtor, which holds title to this date. Luke and his family moved in to Sea Cliff shortly

21   after it was acquired and continue to live there. In January 2010, Debtor elected Luke's wife,

22   Katherine ("Kay" together with Luke, the "Brugnaras") as President. For the past two decades,

23   Luke and Kay have incurred significant tax debts: together, they owe over $6.4 million to the

24   FTB and over $1.8 million to the IRS (Joint Statement of Facts, ¶ ¶ 3-17).

25

26

27   _____

[1] Debtor contests some of these facts, and the court has bolded all contested facts in Exhibit A.
The court has confined its analysis to the facts that were not contested, which therefore are not
bolded.

28   [2] The court has included Debtors' principals' first names to avoid confusion because they share
the same last name. No disrespect is intended.

-2-

1    The Taxing Authorities asserted nominee liens for these debts against Sea Cliff, so Luke

2 and Kay, through Debtor, commenced this adversary proceeding to seek a determination that

3 these liens are not valid. The Taxing Authorities now seek summary judgment, claiming that

4 the both alter ego and nominee theories apply in their favor.

5 **Legal Standard**

6    Federal Rule of Civil Procedure 56, made applicable through Federal Rule of

7 Bankruptcy Procedure 7056, states that summary judgment shall be granted if the movant

8 shows that there is no genuine dispute as to any material fact and the movant is entitled to

9 judgment as a matter of law. A fact is material if it might affect the outcome of a proceeding

10 under the governing substantive law. In a motion for summary judgment, the moving party

11 bears the initial burden of persuasion in demonstrating that no issues of material fact exist.

12 *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986). A genuine issue of material fact

13 exists when the trier of fact could reasonably find for the non-moving party. *Id.* at 248. The

14 court may consider pleadings, depositions, answers to interrogatories and any affidavits.

15 *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). In determining whether the movant has met

16 its burden, the court should consider all reasonable inferences in a light most favorable to the

17 non-movant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

18 **Requests for Judicial Notice**

19    The Taxing Authorities jointly requested the court take judicial notice of certain items

20 (dkt. 69-2). The items consist of documents recorded with the San Francisco Office of the

21 Assessor-Recorder and are publicly available. The court grants this request pursuant to Federal

22 Rule of Evidence 201.

23    Debtor also submitted a request for judicial notice (dkt. 26) requesting judicial notice of

24 two items. The items can be accurately and readily determined from sources whose accuracy

25 cannot reasonably be questioned. The court grants this request pursuant to Federal Rule of

26 Evidence 201.

27

28

## II. ANALYSIS

**Debtor's Motion for Summary Judgment**

Debtor's motion for summary judgment seeks to establish that nominee and alter ego theories are not available to the Taxing Authorities. Any arguments regarding the applicability of either theory are dealt with below. There is little evidence to support the motion. The only evidence submitted by Debtor are two declarations in opposition to the Taxing Authorities' motions. The declaration submitted on Luke's behalf is inadmissible as he did not sign it. *See* 28 U.S.C. § 1746. Kay's declaration (dkt. 81) is dealt with in the analysis below. As Debtor has not met its burden, the motion is denied.

**Taxing Authorities' Motions for Summary Judgment**

**<u>Alter Ego Theory</u>**

The Taxing Authorities assert that they should be allowed to enforce their liens against Sea Cliff using an alter ego theory. The FTB seeks to satisfy its claim of $6.4 million against Luke and Kay, and the IRS seeks to satisfy its claim of $1.8 million.

An alter ego is an entity lacking economic substance, essentially acting as the other self of an individual or entity. *United States v. Scherping*, 187 F.3d 796, 803, 804 (8th Cir. 1999). In California, the conclusion that one is the alter ego of another may permit a remedy known as piercing the corporate veil, by which an individual is held liable for the acts of a corporation and requires (1) such unity of interest and ownership that the separate personalities of the corporation and individual do not exist and (2) an inequitable result will follow if the acts are treated as those of the corporation alone. *RRX Indus., Inc. v. Lab-Con, Inc.*, 772 F.2d 543, 545 (9th Cir. 1985) (citing *Automotriz Del Golfo De California S.A. De C.V. v. Resnick*, 47 Cal.2d 792, 796, 306 P.2d 1, 3 (1957)). Reverse veil piercing, where a corporation may be held liable for the acts of an insider individual, is applicable in California under certain circumstances. *See Taylor v. Newton*, 117 Cal.App.2d 752, 758–60 (1953). A variant of this, known as "outside" reverse veil piercing, occurs when a third party (an 'outsider') attempts to reach corporate assets to satisfy claims against an individual shareholder. *See Postal Instant Press, Inc. v. Kaswa Corp.*, 162 Cal. App. 4th 1510, 1518 (2008) (hereafter "*Postal*").

The Taxing Authorities and Debtor agree that *Postal* is determinative of whether a finding of alter ego could be available here. In *Postal*, the California Court of Appeal determined that this theory was not available to a third-party creditor attempting to reach corporate assets in order to satisfy its debt against an individual shareholder. *Postal*, 162 Cal. App. 4th at 1523-24. The court excepted federal tax cases from its decision, stating in a footnote that "[m]any courts have permitted the United States to use a reverse piercing theory to recover a taxpayer's delinquent tax liability from the taxpayer's alter ego business entity . . . . These cases recognize that 'reverse piercing is a well-established theory in the federal tax realm" that advances the policies of "avoiding fraud and collecting delinquent federal taxes.'" *Id.* at 1521 n. 3 (citing *Scherping*, 187 F.3d at 803, 804). Among the cases cited in the footnote is *Brownfield Inv. Corp., N.V. v. U.S.*, 28 F.2d 105 (9th Cir. 1994). There, the court permitted reverse veil piercing to impose tax liabilities (citing *Towe Antique Ford Foundation v. IRS*, 999 F.2d 1387, 1390). *Brownfield Inv. Corp.*, 28 F.2d at 105. Other federal courts in California have held that reverse veil piercing is permitted for federal taxing authorities. *See Prompt Staffing, Inc. v. United States.*, 321 F.Supp.3d 1157, 1178 (C.D. Cal. 2018) (holding that reverse veil piercing is permissible and specifically stating that *Postal* permitted the use of reverse veil piercing in federal tax lien cases); *see also United States v. Boyce*, 148 F.Supp.2d 1069, 1094 (S.D. Cal. 2001), amended (Apr. 27, 2001), *aff'd*, 36 F.App'x 612 (9th Cir. 2002). As such, it appears settled that the IRS is permitted to employ alter ego theory and consequently, the California alter ego analysis is appropriate here.

*Postal* and its progeny are less clear about the result for the FTB. *Postal* referred specifically to the federal taxing authorities. It did not indicate state taxing authorities are extended the same benefit. Absent California Supreme Court precedent on the issue, the court must predict how the California Supreme Court would rule. *See Fourth Inv. LP v. U.S.*, 720 F.3d 1058, 1068-69 (9th Cir. 2013) ("Given " 'the absence of a controlling California Supreme Court decision' " . . . we " 'must predict how the California Supreme Court would decide the issue, using intermediate appellate court decisions, statutes, and decisions from other jurisdictions as interpretive aids' " . . . . When California courts encounter a dearth of

-5-

California appellate decisions on a particular legal question, they "often look to decisions of California federal courts and out-of-state cases in resolving" the issue") (citations omitted).

Here, save for *Postal*, there is little appellate case law on point. *Postal* referred to two California appellate cases. In *Taylor v. Newton*, the court concluded that the subject corporation was the alter ego of its sole stockholder, but the court did not address the doctrine of reverse piercing in its analysis, and instead decided that a separate corporate existence would be an injustice. *Taylor*, 117 Cal. App. 2d at 761. *NEC Electronics Inc. v. Hurt*, 208 Cal.App.3d 772 (1989) was a traditional alter ego case, where the appellate court ultimately reversed the trial court's decision to add the corporation's sole shareholder to a judgment against the corporation, because there was insufficient evidence that the shareholder had an opportunity to litigate the underlying action. *Id.* at 781. Neither case is dispositive here, at least in part because neither case dealt with tax debt.

Another California appellate case, decided after *Postal*, recently held that a creditor was not per se prohibited from reverse piercing. *Curci Investments, LLC v. Baldwin*, 14 Cal. App. 5th 214 (2017). In *Curci*, a creditor sought to add a corporate entity as a judgment debtor to a judgment held personally against the individual that controlled the entity. *Id.* The trial court, citing *Postal*, held that reverse veil piercing was not available in California. *Id.* Reversing the trial court, the appellate court held that *Postal* was distinguishable and that reverse piercing was permissible in those circumstances. *Id.* at 218. The facts in *Curci* are similar to the facts here: there, an individual formed a corporate entity with his wife and borrowed millions in a personal capacity, then failed to pay their creditor while the corporate entity distributed millions to trusts set up for the individual's family. *Id.* at 218-19. The appellate court distinguished *Postal*, holding that it did not preclude outside reverse veil piercing. *Id.* at 222. It reasoned that *Postal* was expressly limited to corporations, while the subject case dealt with an LLC. *Id.* In addition, the individual in *Curci* held a 99% interest in the corporate entity, while his wife held a 1% interest, so there were no innocent members of that entity to affect. *Id.* It also stated that creditors of a corporation may step into shareholders' shoes—a remedy that is not available to creditors of LLCs. *Id.* The court then reasoned that the creditor had been trying to collect on its judgment for half a decade, that the corporate entity was a vehicle to hold and invest the

-6-

individual's money, and that the individual had complete control over the entity, which was essentially being used to pay the individual and his family. For these reasons, reverse veil piercing was available in those circumstances. *Curci*, 14 Cal. App. 5th at 224. Although *Curci* is not wholly applicable because it dealt with an LLC and not with tax debt, the case establishes that *Postal* does not preclude reverse veil piercing in California and that appellate courts in the state are willing to extend the doctrine of reverse veil piercing in some circumstances.

Because *Curci* is not directly on point, the court may also look to decisions made in California federal courts resolving the issue. *Postal* pointed to one California district court case which did not permit reverse piercing, and which stated that making property of a corporation into the property of a stockholder was not compelled by law or reason. *Olympic Capital Corp. v. Newman*, 276 F.Supp. 646, 658 (C.D. Cal. 1967). That case did not deal with tax debt. Other California federal courts show a general willingness to allow taxing authorities to reverse pierce, as laid out in the analysis above permitting the IRS to employ alter ego theory. *See Brownfield Inv. Corp.*, 28 F.2d 105; *Prompt Staffing, Inc.*, 321 F.Supp.3d at 1178 (C.D. Cal. 2018); *Boyce*, 148 F.Supp.2d at 1094.[3]

The court may also look at out-of-state cases. The *Postal* court cited to two Tenth Circuit cases which rejected outside reverse piercing. The second case, *Floyd v. IRS*, rejected outside reverse veil piercing, at least in part, due to the unsettling of corporate creditor expectations. 151 F.3d 1295, 1299 ("For one thing, the prospect of losing out to an individual shareholder's creditors will unsettle the expectations of corporate creditors who understand their loans to be secured—expressly or otherwise—by corporate assets. Corporate creditors are likely to insist on being compensated for the increased risk of default posed by outside reverse-piercing claims, which will reduce the effectiveness of the corporate form as a means of raising credit."). The case also noted that the problems with reverse piercing may be less serious in

---

[3] *Cf. In re Shapow*, 599 B.R. 51, 73-74 (Bankr. C.D. Cal. 2019). There, the court cited to *Curci* in a footnote, acknowledging that *Curci* allowed reverse piercing, but concluding that *Curci* was not applicable because the instant case dealt with a corporation, not an LLC, and thus the plaintiff had other, adequate remedies. *Shapow*, 599 B.R. at 73, n. 17. The availability of other remedies here is dealt with below.

-7-

1   cases where a corporation is controlled by a single shareholder, which would result in there

2   being no third-party shareholders being prejudiced.  *Floyd*, 151 F.3d at 1300.  That court

3   ultimately rejected reverse veil piercing partially due to the absence of a clear statement in state

4   law.  *Id.*

5         Other out-of-state cases have accepted reverse veil piercing, some of which are cases

6   from the Ninth Circuit cited *supra*.  *See Towe Antique Ford Foundation*, 999 F.2d at 1390

7   (applying Montana law); *see also LFC Mktg. Grp., Inc. v. Loomis*, 116 Nev. 896, 904-5 (2000)

8   (reverse veil piercing permitted where particular facts show alter ego relationship and require

9   that corporate fiction be ignored so justice may be promoted);  *In re Phillips*, 139 P.3d 639, 647

10  (Colo. 2006) (outside reverse piercing available but court must consider alternate, less invasive,

11  remedies and an equitable result is not achieved when innocent third parties are prejudiced);

12  *Tisch v. Tisch*, 439 P.3d 89, 99 (Colo. App. 2019) (reverse piercing permitted where no

13  innocent shareholders harmed); *In re Schuster*, 132 B.R. 604, 612 (Bankr. D. Minn. 1991)

14  (outside reverse piercing available, also noting the inequity in allowing the legal fiction of a

15  corporation to triumph over the substance of the debtor's accrual and retention of nonexempt

16  wealth in the face of insolvency); *In re Mass*, 178 B.R. 626, 630 (M.D. Pa. 1995) (reverse

17  piercing available and warranted where business was never treated as a corporate entity and

18  debtors used assets of business as if they were their own); *Scherping*, 187 F.3d at 804 (reverse

19  piercing available to satisfy tax liabilities where taxpayers created sham entities to evade

20  payment of tax debt).  Both California federal cases and these out of state cases reflect a

21  willingness to accept reverse veil piercing in special circumstances that warrant the application

22  and that do not threaten innocent parties.

23        There also appears to be no policy reason to differentiate between state and federal

24  taxing authorities in this context as both seek to satisfy legitimate, overdue tax debt.

25  Consequently, it appears appropriate to allow the FTB the same benefit of asserting alter ego

26  theory.  In addition, the concerns present in *Postal* are not present in this case.  Disadvantaging

27  third parties is not a concern as only the Brugnaras are involved and there are few creditors to

28

-8-

unsceecdle.[4]   *See Postal*, 162 Cal. App. 4th at 1520-21.  There are no non-culpable shareholders because only Luke and Kay have ever had a stake in Debtor.  *See id.* at 1520.  Instead, the only affected parties are Debtor, Kay, Luke, and the Taxing Authorities.

The final, and perhaps largest, concern cited in *Postal* is that reverse piercing is not appropriate in circumstances where alternate remedies are available.  *Id.* at 1522.  Debtor has one asset: Sea Cliff.  As such, an alternate remedy whereby the judgments attach to Debtor's shares will not yield a different result.[5]  The availability of other legal remedies is also made unclear by the fact that Sea Cliff was never held by the Kay and Luke as individuals, and was instead transferred to Debtor through Brugnara Properties V—so a fraudulent transfer[6] action may not prove fruitful as Luke and Kay did not themselves convey Sea Cliff to Debtor.  *See id.* at 1521 (citing to a Tenth Circuit case for the proposition that disregard of the corporate form should only be granted when legal remedies are inadequate).  As the concerns expressed in *Postal* are not present, alternative remedies do not appear more suitable, and no California Supreme Court precedent exists on the matter, the court concludes that alter ego theory is also available to the FTB in this case.

Debtor claims that the state court order submitted in its request for judicial notice has already decided that alter ego theory does not apply here.  The order is a minute order which denies a creditor's motion to amend a judgment and add Debtor here as a corporate judgment debtor on a judgment that was entered by default.  The court declined to amend the judgment based on due process issues.  The order cites *Postal* to conclude that reverse piercing was

_____

[4] The claims register shows only two other claims in this case, a small claim from the United States Trustee and the mortgage owed to Wells Fargo.  The secured creditors with liens against Sea Cliff will continue to hold their liens regardless of the outcome here, and there is nothing to indicate that their priority will be affected.

[5] In addition, Luke appears to no longer be a shareholder of Debtor, having allegedly relinquished these shares to Kay in 2005.  As a result, any remedy by which judgments would attach to shares would not extend to Luke.  This would be an inequitable result.

[6] It is also far too late to pursue a fraudulent transfer action in the state of California, where the statute of limitations has a maximum of seven years.  Cal. Civ. Code § 3439.09.

particularly inappropriate where a party seeks to reverse pierce by way of a postjudgment motion to amend a judgement. The order is irrelevant to this proceeding and is not dispositive.

Again, in California, alter ego theory is used to pierce the corporate veil to show an individual is liable for the acts of a corporation and requires (1) such unity of interest and ownership that the separate personalities of the corporation and individual do not exist and (2) that an inequitable result will follow if the acts are treated as those of the corporation alone. The record readily supports the application of the theory here.

(1) Unity of Interest

There are several factors involved in determining unity of interest, the most relevant of which are as follows:

- commingling of funds and other assets,
- failure to segregate funds of the separate entities, and the unauthorized diversion of corporate funds or assets to other than corporate uses;
- the treatment by an individual of the assets of the corporation as his own;
- the failure to obtain authority to issue stock or to subscribe to or issue the same;
- the holding out by an individual that he is personally liable for the debts of the corporation;
- the failure to maintain minutes or adequate corporate records,
- sole ownership of all of the stock in a corporation by one individual or the members of a family;
- the use of the same office or business location;
- the failure to adequately capitalize a corporation;
- the total absence of corporate assets, and undercapitalization;
- the use of a corporation as a mere shell, instrumentality or conduit for a single venture or the business of an individual or another corporation;
- the concealment and misrepresentation of the identity of the responsible ownership, management and financial interest, or concealment of personal business activities;
- the disregard of legal formalities and the failure to maintain arm's length relationships among related entities;

-10-

- the diversion of assets from a corporation by or to a stockholder or other person or entity, to the detriment of creditors, or the manipulation of assets and liabilities between entities so as to concentrate the assets in one and the liabilities in another;

- and the formation and use of a corporation to transfer to it the existing liability of another person or entity.

*Zoran Corp. v. Chen*, 185 Cal. App. 4th 799, 811–12 (2010) (citing *Morrison Knudsen Corp. v. Hancock, Rothert & Bunshoft, LLP*, 69 Cal. App. 4th 223, 249-250 (1999); *see also Associated Vendors, Inc. v. Oakland Meat Co.*, 210 Cal. App. 2d 825, 838-840 (1962); *Sharp v. Salyer (In re SK Foods, Ltd.)*, 499 B.R. 809, 840-41 (Bankr. E.D. Cal. 2013) (stating that recognition of separateness depends on whether those in control respect that separation, citing *Palmas Assocs. v. Las Palmas Center Assocs.*, 235 Cal. App. 3d 1220 (1991)).

As a preliminary matter, Luke is no longer a shareholder of Debtor, having transferred his shares to Kay in 2005. The parties argue about the legitimacy of this transfer, but as equitable ownership and control is sufficient, the court declines to decide this issue. *See Sonora Diamond Corp. v. Superior Court*, 83 Cal. App. 4th 523, 538 (2000) ("Under the alter ego doctrine, then, when the corporate form is used to perpetrate a fraud, circumvent a statute, or accomplish some other wrongful or inequitable purpose, the courts will ignore the corporate entity and deem the corporation's acts to be those of the persons or organizations actually controlling the corporation, in most instances the equitable owners.").

Many of these factors are satisfied. It is undisputed that all stock in Debtor has been held by Luke or Kay since Debtor's formation. It is undisputed that Sea Cliff is both the business location of Debtor and the Brugnaras' family home.

Luke, Kay, and Debtor also commingled their funds, and either admitted to doing so, or the evidence as to these incidents has not been materially disputed. In the bankruptcy case filed in 2009 by another entity, Brugnara Corporation, the Statement of Financial Affairs stated that one checking account in the name "Brugnara Corporation" made payments to vendors and lenders secured by Sea Cliff and paid the living expenses of "Luke Brugnara and his family" and "Luke and Kay Brugnara are also guarantors of the junior secured debt on Debtor's property." (Ex. 84). This information, while not exactly on point in this analysis, demonstrates

-11-

Luke and Kay's reluctance to establish a designated bank account with which to pay Sea Cliff's (and consequently Debtor's) expenses. The statement was signed by Luke as President of that entity on January 6, 2009. In the same case, Luke submitted a declaration stating that he was president of Debtor here, that Debtor "has never had a bank account" and that Debtor had not engaged in any transactions save for the acquisition of Sea Cliff (Ex. 83). Per submitted bank statements, Kay withdrew funds acquired through Sea Cliff's refinances several times. Some of these withdrawals were large cash withdrawals following a refinance. There are several other instances in which Kay withdrew money from Debtor's checking account. For example:

- Kay once withdrew funds for settlement of a lawsuit, which is clearly reflected in a bank statement from February 2017 (Ex. 120-C);

- Debtor's debit card has been used to purchase hotel rooms, television service, and retail purchases (Ex. 120-D, Bates JPMC2_0100);

- Debtor's debit card has been used to purchase approximately $20,000 in dental work for Kay and the Brugnaras' children (Ex. 111 p.150).

Other instances have been recorded in the Joint Statement of Facts. In addition, Sea Cliff was pledged to satisfy a personal judgment against Luke and Kay (Ex. 24; Ex. 124) and was pledged to post a bond for Luke's release from custody (Ex. 26). Kay's declaration (dkt. 81) states that she believed she had a corporate purpose for making the purchases using corporate funds, but offers nothing more in support of this assertion. The other facts listed in the declaration have not been considered in the court's analysis and therefore do not present a relevant dispute.[7] As well as commingling, this evidence demonstrates Luke and Kay's tendency to use Debtor's assets as their own.

The Brugnaras' use of Debtor's assets as their own is indisputable. The Brugnara family moved into Sea Cliff since it was acquired in 2002 and have lived there almost

---

[7] For example, the declaration states that Kay purchased a car to transact company business and that it was in her name for insurance purposes. The court has not considered this purchase in its analysis.

-12-

1   continuously since.[8]   The property has never been leased to anyone outside of the Brugnara

2   family and it is Debtor's only asset.

3         Further, Debtor does not observe corporate formalities, which is evidenced by the fact

4   that it does not appear to have board meetings or keep minutes for any board meetings held,

5   despite regular meetings appearing being required in Debtor's bylaws (Ex. 121; Ex. 100[9] ; Ex.

6   101[10] ).  The federal corporate tax returns filed by Debtor disclose virtually no information.[11]

7   Aside from the non-informative tax returns, few corporate documents have been produced in

8   this action, and no other rebutting evidence has been submitted to suggest Debtor has

9   meaningfully observed corporate formalities.

10        It is difficult to construe Debtor as anything other than a shell company used to hold title

11  to Sea Cliff.  As the tax returns show, Debtor has no income.  Despite claiming to be a real

12  estate business, from at least 2010 to 2019, Debtor did not buy or lease property.[12]   Debtor has

13  never had any other assets, and the only transaction Debtor has ever engaged in has been the

14  acquisition of Sea Cliff.  Debtor has never had employees, although it has accrued an alleged

15  liability of $200,000 each year to Kay as president (Ex. 116).  This amount is owed to Kay as a

16  rent credit to reside at Sea Cliff, in exchange for her duties as president and secretary of Debtor.

17  _____

18  [8] The family moved to Las Vegas in December 2008 and returned in 2009 and have briefly
    lived in other places (Ex. 100, p. 29; *see also* Ex. 60; Ex. 111, p. 75 (as representative of
19  Debtor, Kay stated that no one outside of the family has lived in Sea Cliff since it was acquired
    in 2002)).
20  [9] Kay testified that she did not know whether she had held shareholder meetings for Debtor
21  since 2010, and that if she had, they were informal and that she did not keep any records of any
    meetings held.
22  [10] Luke testified that there were no meetings because one could not hold a shareholders meeting
    with just one shareholder.  Testifying about when he was sole shareholder, he stated "When I
23  owned the shares, did I meet with myself? I meet with myself every day, 24/7, when I go to
    bed, when I wake up, when I walk around." (Ex. 101, p. 130).  The Brugnaras submit nothing
24  further to show that they held these meetings.
25  [11] For example, the federal corporate tax returns for 2005, 2006, 2007, 2008, 2009, and 2010
    contain no income, expenses, capital, loans, or distributions (Ex. 151-156).
26  [12] As Debtor's representative, Kay described Debtor's business as purchasing real estate, then
27  went on to say that she did not know how many properties Debtor had purchased since its
    conception, and that Debtor had not bought, sold, or leased any property since she became
28  president in 2010.  When asked about her "vision" for Debtor's purpose, she responded "[t]o
    hold the property." (Ex. 111).  This furthers the conclusion that Debtor is a shell company,
    another factor in favor of an alter ego finding.

-13-

1    When asked about her responsibilities as president, Kay stated that she ran the property,

2    conducted maintenance, dealt with legal issues and procured loans for refinances (Ex. 111).[13]

3         As shown above, these factors in favor of unity of interest are overwhelmingly satisfied

4    in favor of the Taxing Authorities.

5         (2)    Inequitable Result

6         Here, there is clear inequity.  As detailed above, Debtor serves no business purpose save

7    for holding Sea Cliff as the Brugnaras' residence and is essentially an empty shell standing

8    guard over the Sea Cliff property.  Recognition of Debtor as separate from Luke and Kay would

9    allow them to evade tax liability through an entity holding their personal residence.  *See Boyce*,

10   148 F.Supp.2d at 1094 (finding inequity where recognition of a separate corporate entity would

11   result in the individuals evading taxes simply by setting up an entity to hold and manage the

12   property that the individuals used and received benefit from).  Consequently, an inequitable

13   result would follow were Sea Cliff considered separate from Luke and Kay.

14        The Taxing Authorities have met their burden to show that there is no materially

15   disputed fact concerning Debtor's liability under alter ego theory.  Summary judgment will be

16   granted on this ground.

17   **Nominee Theory**

18        Through Claim 3-2, in the amount of $6.2 million, the FTB seeks recovery against

19   Debtor as the nominee of Luke as to the secured amount of the claim.  The IRS also seeks a

20   determination that Debtor is the nominee of Luke and Kay for the entirety of its claim.

21        In the Ninth Circuit, a nominee is one who holds bare legal title to property for the

22   benefit of another.  *Fourth Inv.*, 720 F.3d at 1066.  To determine whether nominee status exists,

23   the court evaluates the totality of the circumstances based on the following factors:

---

[13] Answering as representative of Debtor.  In her personal capacity, when asked about the value
of the work she puts in as president and whether that work should be valued at $200,000, Kay
responding by stating that her salary is at least partially justified by the fact that she takes care
of the children and takes care of household duties (Ex. 100).  That childcare and household
duties could factor into Kay's corporate compensation is further evidence that there is little
separation between Debtor and the Brugnaras and that their assets and duties were comingled.

-14-

1     (1) whether inadequate or no consideration was paid by the nominees;

2     (2) whether the properties were placed in the nominees' names in anticipation of a

3     lawsuit or other liability while the transferor remains in control of the property;

4     (3) whether there is a close relationship between the nominees and the transferor;

5     (4) failure to record the conveyances;

6     (5) whether the transferor retained possession; and

7     (6) whether the transferor continues to enjoy the benefits of the transferred property.

8     *Fourth Inv.*, 720 F.3d at 1070.  The overarching consideration is whether "whether the

9     taxpayer exercised active or substantial control over the property." *Id.* (citing *In re Richards*,

10    231 B.R. 571, 579 (E.D. Pa. 1999)).

11    *(1)     Whether inadequate or no consideration was paid by the nominees*

12    In October 2002, Brugnara Properties V transferred title to Sea Cliff to Debtor by way

13    of a grant deed that was recorded on October 21, 2002 (Ex. 7).  Brugnara Properties V had

14    acquired the property in July of that year, using a financing of $8.8 million provided by Vestin

15    Mortgage.  The Taxing Authorities assert that Debtor paid no consideration for this transfer.

16    Debtor contends that it paid consideration by assuming the mortgage associated with the

17    property.  Because assumption of debt is adequate consideration, this factor does not weigh in

18    favor of a finding of nominee status.  *See* Cal. Civ. Code § § 1605-1615.

19    *(2)     Whether the properties were placed in the nominees' names in anticipation of a*

20    *lawsuit or other liability while the transferor[14] remains in control of the property*

21    The Taxing Authorities argue that Luke was aware of tax liabilities and impending child

22    support payments prior to Sea Cliff's acquisition.  Debtor argues that the property was

23    purchased before the tax liabilities were assessed and that Luke "knew that he was not the father

---

[14] The transferor here is Brugnara Properties V, not Luke or Kay.  Luke has admitted to being in full control of Brugnara Properties V at the time of the transfer (Ex. 101, p. 250).  Actual transfer of legal title is not necessary to impose a nominee lien.  *Politte v. United States*, 2010 WL 11512354, at *3 (citing *Holman v. United States*, 505 F.3d 1060, 1065 (10 Cir. 2007) (concluding, *inter alia*, that the lower court erred in holding that, standing alone, lack of transfer of legal title was sufficient as a matter of law to defeat enforcement of a nominee lien asserted by the IRS).

-15-

of the child of the person who filed the child custody and support case" and that the case was dismissed with no finding of paternity.

In his deposition, Luke stated: "I was -- went to -- I first dealt with the IRS in 2001; okay? 2001 they filed a complaint against me for tax years 1993 through 1999; okay? They said, "You owe," I believe it was, "$11 million," from what I remember. Again, I could be off; but it was in the millions of dollars; okay? And this was a direct result after I bought Silver City Casino and they were digging into my taxes; okay?" (Ex. 101, p. 17). As such, Luke has admitted that he knew of significant, impending, tax liabilities in 2001, and he subsequently pled guilty to filing false tax returns for the tax years 2000, 2001, and 2002. Sea Cliff was purchased in 2002.

A petition for custody and support was filed against Luke on November 13, 2000 (Ex. 92). In March 22, 2002, Luke was ordered to pay temporary child support payments, which payments increased and became final on December 8, 2003 and amounted to $4,922/month (Ex. 94, 97).[15] Debtor's contention that Luke "knew" he was not the father of this child is refuted by the final judgment entered by the superior court, which includes a finding of parenthood (Ex. 97), but this is irrelevant to whether or not Luke was aware of the impending liability. He was aware of the lawsuit as early as 2000 and became aware of his child support payments in March 2002. Sea Cliff was purchased by Brugnara Properties V in July of 2002.

It is clear that Luke knew of these obligations prior to the transfer of Sea Cliff to Debtor. These facts indicate that the property was held by Debtor in anticipation of the large liabilities of its owners. *See United States v. Edwards*, 2018 WL 2078834, at *5 (E.D. Cal. 2018), report and recommendation adopted, 2018 WL 2499386 (E.D. Cal. 2018) (where taxpayers' knowledge of impending tax debt combined with residence in and physical possession of property, for which no rent was ever paid, was sufficient to satisfy second nominee factor); *see also United States v. Kraus*, 2018 WL 1610225, at *6 (W.D. Wash. 2018) (ongoing disputes over tax delinquencies was evidence supporting second nominee factor). It is also clear that

_____

[15] When Luke failed to pay these child support payments, abstracts of judgment were recorded against him personally and his entities, including Debtor, further demonstrating the commingling of assets and liabilities (Ex. 31).

-16-

Luke and Kay have retained control over Sea Cliff, as they reside in it and make every decision regarding its maintenance and use.

*(3) Whether there is a close relationship between the nominees and the transferor*

As stated earlier in this decision, Kay and Luke have always held, been in control of, and been the principal officers and directors of Debtor. Debtor has had no other employees. There are no other parties with whom Debtor could possibly have a closer relationship. Consequently, this factor is satisfied in favor of a nominee finding.

*(4) Failure to record the conveyances*

The conveyance to Debtor was recorded, thus, this factor does not support a finding of nominee status.

*(5) Whether the transferor retained possession; and (6) whether the transferor continues to enjoy the benefits of the transferred property.*

The Brugnaras continue to live in Sea Cliff, using it as their principal residence. Debtor does not dispute that the Brugnaras continue to enjoy the benefits of this property, stating in its opposition that they derive a benefit because they continue to live on the property, but disputing that this benefit is sufficient to meet the standard of summary judgment. The transferred property is a residential home—it is unclear what further benefit could be derived from a residential property other than unfettered residence without the imposition of rent. Thus, this factor supports a nominee finding.

The totality of the circumstances indicates that Debtor is acting as a nominee for Kay and Luke, holding title to Sea Cliff while Luke and Kay evade their tax debts. Most consequential is the overarching conclusion that Sea Cliff is being held by Debtor while the Brugnaras enjoy all the benefits of using it as their residence. As stated many times in this analysis, Sea Cliff is completely held and controlled by the Brugnaras. *See Fourth Inv.*, 720 F.3d at 1070.

Having proffered the facts necessary for a finding of summary judgment, the Taxing Authorities have met their burden. Debtor has not submitted any evidence refuting or even challenging the evidence submitted by the Taxing Authorities. Consequently, the Taxing Authorities prevail on their nominee theory and summary judgment is granted on this ground.

-17-

**III. CONCLUSION**

Debtor's motion for summary judgment is DENIED. The IRS and FTB's separate motions for summary judgment are hereby GRANTED. The Taxing Authorities are requested to serve and upload separate orders granting their motions for summary judgment for their respective liens, and the final judgment concluding this adversary proceeding. They should comply with Bankruptcy Local Rule 9021-1.

**\*\*\* END OF ORDER \*\*\***

UNITED STATES BANKRUPTCY COURT
for the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **<u>COURT SERVICE LIST</u>**

**Kay Brugnara**
224 Sea Cliff Avenue
San Francisco, CA 94121

UNITED STATES BANKRUPTCY COURT
for the Northern District of California

1
2   **EXHIBIT A**
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

-20-

1  XAVIER BECERRA
   Attorney General of California
2  KAREN W. YIU
   Supervising Deputy Attorney General
3  CARA M. PORTER
   Deputy Attorney General
4  State Bar No. 266045
     455 Golden Gate Avenue, Suite 11000
5    San Francisco, CA  94102-7004
     Telephone:  (415) 510-3508
6    Fax:  (415) 703-5480
     E-mail:  Cara.Porter@doj.ca.gov
7
   *Attorneys for California Franchise Tax Board*
8

9  RICHARD E. ZUCKERMAN
   Principal Deputy Assistant Attorney General
10
   MAHANA K. WEIDLER (MD BAR)
11 Trial Attorney, Tax Division
   U.S. Department of Justice
12     P.O. Box 683, Ben Franklin Station
       Washington, D.C. 20044-0683
13     Tel.:    (202) 616-1955
       Fax:    (202) 307-0054
14     Email: *mahana.k.weidler@usdoj.gov*

15 *Of Counsel:*
   DAVID L. ANDERSON
16 United States Attorney

17 *Attorneys for the United States of America*

18

19              IN THE UNITED STATES BANKRUPTCY COURT

20            FOR THE NORTHERN DISTRICT OF CALIFORNIA

21                     SAN FRANCISCO DIVISION

22

| | |
|---|---|
| **In re** | CASE NO. 17-30501 |
| **BRUGNARA PROPERTIES VI CORPORATION,** | Chapter 7 |
| Debtor. | Adversary No. 17-03071 |

| | |
|---|---|
| **BRUGNARA PROPERTIES VI CORPORATION,** | **JOINT STATEMENT OF FACTS IN SUPPORT OF THE UNITED STATES' AND FRANCHISE TAX BOARD'S MOTIONS FOR SUMMARY JUDGMENT** |
| Plaintiff | |
| v. | |
| **UNITED STATES OF AMERICA, DEPARTMENT OF THE TREASURY, INTERNAL REVENUE SERVICE; STATE OF CALIFORNIA, FRANCHISE TAX BOARD,** | Date: April 25, 2019<br>Time: 10:30 a.m.<br>Place: Courtroom: 17<br>Judge: The Honorable Dennis J. Montali |
| Defendants. | Trial Date: None Set<br>Action Filed: October 24, 2017 |

**TABLE OF CONTENTS**

I.   Luke and Kay Brugnara ............................................................................................. 1

    A.   Luke and Kay Brugnara are the taxpayers whose tax liabilities have given rise to the IRS's and FTB's nominee liens and/or alter ego claims at issue in this adversary proceeding. .............................................................................. 1

    B.   Luke and Kay collectively owe over $1.8 million to the IRS dating back to tax year 1993. ..................................................................................................... 1

        1.   Luke's Federal Tax Liability ............................................................... 1

        2.   Kay's Federal Tax Liability ................................................................ 2

    C.   Luke and Kay collectively owe over $6.4 million to FTB. .................................. 3

    D.   As early as November 2000, Luke anticipated a child-support judgment against him. ........................................................................................................ 4

    E.   Since 1992, Luke has formed at least ten entities to hold title to real property (collectively, the "Brugnara Entities"). ............................................... 5

    F.   Luke has been incarcerated for various periods of time since 2010. ..................... 8

II.  The Debtor: BPVI ..................................................................................................... 9

    A.   Luke created BPVI in 2000, and appointed himself its sole shareholder and officer. ............................................................................................................. 9

    B.   Luke and Kay do not follow any corporate formalities. .................................... 12

    C.   BPVI has no business purpose other than to hold title to the Brugnaras' personal residence. ......................................................................................... 14

    D.   Since 2009, BPVI has filed for bankruptcy protection four times. ..................... 15

        1.   The 2009 Bankruptcy Case ............................................................... 15

        2.   The 2010 Bankruptcy Case ............................................................... 16

        3.   The 2014 Bankruptcy Case ............................................................... 16

        4.   The Current Bankruptcy Case ........................................................... 17

    E.   BPVI has never had a legitimate bank account. ................................................ 18

    F.   BPVI has filed tax returns only when required to do so for bankruptcy or financing purposes. ....................................................................................... 21

III. The SeaCliff Property ............................................................................................. 23

    A.   Luke and Kay used Brugnara Entities to purchase and hold title to SeaCliff. ....... 23

    B.   While SeaCliff has appreciated in value, Luke and Kay have consistently used the increased equity for their personal benefit without reporting any income, compensation, gains or distributions. .................................................. 25

        1.   Luke and Kay used equity from SeaCliff to pay $425,000 to Suerte Holdings to satisfy a personal judgment. ......................... 25

        2.   Luke and Kay used equity from SeaCliff to post bond for Luke's release from federal custody. ........................................... 26

i

**TABLE OF CONTENTS**
(continued)

Page

3. Luke and Kay used SeaCliff as collateral for loans benefitting the Brugnara Entities .................................................. 27

4. While living there rent-free, Luke and Kay used SeaCliff's equity to pay its mortgage, taxes, insurance premiums, and their personal living expenses. ...................................................... 28

C. Luke and Kay have comingled their own personal finances with BPVI's finances. ............................................................................................. 30

D. Kay decides when and how to maintain SeaCliff. ................................. 31

E. Kay purposely misled a lender in connection with SeaCliff's 2016 maintenance and renovation. ................................................................. 31

F. Luke and Kay both claim that their compensation for being an officer of BPVI is equivalent to the rent for SeaCliff. ........................................ 33

ii

Defendants, the United States of America (on behalf of the Internal Revenue Service (the "IRS")) and the California Franchise Tax Board ("FTB") hereby submit the following Joint Statement of Facts in support of their respective motions for summary judgment.

## I. LUKE AND KAY BRUGNARA

**A. Luke and Kay Brugnara are the taxpayers whose tax liabilities have given rise to the IRS's and FTB's nominee liens and/or alter ego claims at issue in this adversary proceeding.**

1. Luke ("Luke") and Katherine ("Kay") Brugnara have been married since 1989. (Ex. 100: Excerpts from the Transcript of Kay's Deposition taken on August 1, 2018 ("K. Brugnara Depo. Tr."), 51:18-22.)[1]

2. Luke and Kay have four children: Luke II (22), Vincent (19), and two teenage daughters. (Ex. 111: Excerpts from the Transcript of Brugnara Properties VI, Corporation's ("BPVI") Deposition taken on November 26, 2018, pursuant to Fed. R. Civ. P. 30(b)(6) - Kay Brugnara as Designee ("BPVI 30(b)(6) Depo. Tr."), 72:4-10.)

**B. Luke and Kay collectively owe over $1.8 million to the IRS dating back to tax year 1993.**

**1. Luke's Federal Tax Liability**

3. Luke has testified that in 2001 the IRS notified him that he owed $11 million in taxes for tax years 1993 through 1999. (Ex. 101: Excerpts from the Transcript of Luke's Deposition taken on August 15, 2018 ("L. Brugnara Depo. Tr."), 17:17-24.)

4. In 2006, Luke filed a petition with the Tax Court disputing the IRS's proposed assessments for tax years 1993-1997. (*See* Ex. 85: Petition, *Brugnara v. Comm'r.*, United States Tax Court, Case No. 4746-06 ("Luke's 2006 Tax Court Case").)

5. In January 2009, the Tax Court found Luke liable for federal income-tax deficiencies for tax years 1993 through 1997. (*See* Ex. 86: Order and Decision, p. 1, Luke's 2006 Tax Court Case".)

---

[1] All exhibits referenced herein are attached to the Declaration of Cara M. Porter in Support of Defendants' Motions for Summary Judgment ("Porter Decl."). Foundation for admission of all exhibits are included in either the Request for Judicial Notice in Support of Defendants' Motions for Summary Judgment, the Porter Decl., or the Declaration of IRS Bankruptcy Specialist Susan Lathrop, each filed concurrently herewith.

1

6.     On the date and in the amounts set forth below, a duly authorized delegate of the Secretary of Treasury made timely assessments against Luke:

| Tax Year | Date of Assessment | Initial Assessment | Balance as of 11/28/2017 |
|---|---|---|---|
| 1993 | 8/10/2009 | $ 70,039.99 | $ 97,768.51 |
| 1994 | 8/10/2009 | $ 79,753.58 | $ 111,713.08 |
| 1995 | 8/10/2009 | $ 110,939.76 | $ 156,220.36 |
| 1996 | 8/10/2009 | $ 54,168.73 | $ 76,617.51 |
| 1997 | 8/10/2009 | $ 123,461.45 | $ 175,698.75 |
| 2006 | 8/31/2009 | $ 62,538.14 | $ 88,225.38 |
| 2007 | 8/2/2010 | $ 159,636.18 | $ 215,683.89 |
| 2008 | 7/26/2010 | $ 281,696.84 | $ 402,879.87 |
| | **Total:** | **$ 942,234.67** | **$ 1,330,811.55** |

(*See* Exs. 127-134: Certified IRS Forms 4340 for Luke for tax years 1993-1997 and 2006-2008.)

7.     Luke filed another petition with the Tax Court in 2012. (*See* Ex. 88: Petition, *Brugnara v. Comm'r.*, United States Tax Court, Case No. 10243-12 ("Luke's 2012 Tax Court Case").) In October 2013, the Tax Court entered a Decision and Order validating the IRS's assessments against Luke for tax years 1993 through 1997 and 2006 through 2008, and authorized the IRS to proceed with collection action against Luke and his assets. (*See* Ex. 89: Order and Decision, pp. 1, 7, Luke's 2012 Tax Court Case.)  The Ninth Circuit later affirmed the Tax Court's decision. (*See* Ex. 87: Court Docket, p. 2, Luke's 2012 Tax Court Case.)

8.     On August 21, 2014, the IRS filed with the San Francisco County Assessor-Recorder's office a Notice of Federal Tax Lien against BPVI as the nominee of Luke. (Ex. 1: Certified Notice of Federal Tax Lien ("NFTL") filed against BPVI as nominee of Luke.)

### 2.     Kay's Federal Tax Liability

9.     In 2005, the IRS proposed to assess Kay with income-tax liability for tax years 1994-1997. (*See* Ex. 90: Petition with Ex. A: Notice of Deficiency, *Brugnara v. Comm'r*, United States Tax Court, Case No. 4508-06 ("Kay's Tax Court Case").)

10.     Kay challenged the 1994-1997 proposed assessments by filing a petition in Tax Court in 2006. (*See* Ex. 90: Petition, Kay's Tax Court Case.)

2

11.     In January 2009, the Tax Court entered a Decision and Order finding Kay liable for federal income tax deficiencies for tax years 1994 through 1997. (*See* Ex. 91: Order and Decision, Kay's Tax Court Case.)

12.     On the date and in the amounts set forth below, a duly authorized delegate of the Secretary of Treasury made timely assessments against Kay:

| Tax Year | Date of Assessment | Initial Assessment | Balance as of 11/28/2017 |
|---|---|---|---|
| 1994 | 7/21/2011 | $ 78,275.15 | $ 101,848.20 |
| 1995 | 7/21/2011 | $ 108,883.29 | $ 142,615.73 |
| 1996 | 7/21/2011 | $ 53,164.59 | $ 70,002.24 |
| 1997 | 7/21/2011 | $ 121,172.84 | $ 175,234.48 |
| | **Total:** | **$ 361,495.87** | **$ 489,700.65** |

(*See* Ex. 141-144: Certified IRS Forms 4340 for Kay for tax years 1994-1997.)

13.     On August 21, 2014, the IRS filed with the San Francisco County Assessor-Recorder's office a Notice of Federal Tax Lien against BPVI as the nominee of Kay. (Ex. 2: Certified NFTL recorded against BPVI as nominee of Kay.)

14.     On November 22, 2017, the IRS filed a secured claim in the Current Bankruptcy Case in the amount of $1,809,309.14, arising from the two nominee NFTL's recorded against BPVI as nominee of Luke and Kay. (Ex. 69: Claim 2-2, *In re BPVI*, United States Bankruptcy Court for the Northern District of California, Case No. 17-30501 ("Current Bankruptcy Case").)

**C.      Luke and Kay collectively owe over $6.4 million to FTB.**

15.     On January 26, 2017, FTB recorded a Notice of State Tax Lien ("NSTL") with the San Francisco County Assessor-Recorder's office as Recording No. 2017-K401460-00, against BPVI as the nominee of Luke D. Brugnara for tax years 2001 through 2004 and 2006 through 2008. (Ex. 3: NSTL recorded against BPVI as nominee of Luke.)

16.     On November 20, 2017, FTB filed a secured claim in the Current Bankruptcy Case in the amount of $6,239,487.86, arising from the January 26, 2017 NSTL. (Ex. 70: Claim 3-1, Current Bankruptcy Case.)  On March 28, 2019, FTB amended its claim, resulting in Claim 3-2.

EXHIBIT A JOINT STATEMENT OF FACTS

Claim 3-2 is identical to Claim 3-1 as to the secured liability, and adds an unsecured liability arising from an audit determination. (Ex. 71: Claim 3-2, Current Bankruptcy Case.)

17. On March 28, 2019, FTB filed an unsecured claim in the Current Bankruptcy Case in the amount of $161,402.89, arising from the tax liability of Katherine L. Brugnara, aka Kay McAvoy, as the alter ego of BPVI, for tax years 1994 through 1997. (Ex. 72: Claim 4-2, Current Bankruptcy Case.)

**D.  As early as November 2000, Luke anticipated a child-support judgment against him.**

18. In November 2000, the mother of a newborn child, fathered by Luke, petitioned the San Francisco County Superior Court for custody and support. (Ex. 92: Petition for Custody and Support, *Kristi Riggs v. Luke Brugnara*, San Francisco County Superior Court, Case No. FL039537 ("Child Support Case")); Ex. 93: Responsive Declaration to Order to Show Cause, ¶ 9, Child Support Case.)

19. In March 2002, the San Francisco County Superior Court ordered Luke to pay temporary child support payments of $4,179, beginning February 2002, and continuing until further order of the court, or until the child reaches age 19. (Ex. 94: Findings and Order after Hearing, Child Support Case.)

20. In April 2002, the San Francisco County Superior Court ordered Luke to pay Petitioner's attorneys' fees in the amount of $15,000. (Ex. 95: Minutes from April 24, 2002 hearing, Child Support Case; Ex. 96: Findings and Order After Hearing, Child Support Case.)

21. Because Luke failed to pay any portion of the court-ordered attorneys' fees, in June 2002, the San Francisco County Superior Court added an award of 10% interest and a $100 weekly penalty for Luke's continued failure to pay. (Ex. 96: Findings and Order After Hearing, Child Support Case, Jun. 20, 2002.)

22. On December 8, 2003, the San Francisco County Superior Court entered a judgment in Petitioner's favor, awarding her monthly child-support payments of $4,922, to be continued until further order of court, unless terminated by operation of law, for the benefit of the minor child. (Ex. 97: Judgment, Child Support Case.)

4

EXHIBIT A JOINT STATEMENT OF FACTS

23. In 2004, the California Department of Child Support Services recorded six Abstracts of Support Judgment with the San Francisco County Assessor-Recorder's Office, each arising from the December 8, 2003 child-support judgment; of these six abstracts, four were recorded against Luke and various Brugnara entities, including BPVI, and two were recorded against Luke alone. (Ex. 31: Abstracts of Support Judgment.)

**E. Since 1992, Luke has formed at least ten entities to hold title to real property (collectively, the "Brugnara Entities").**

24. The Brugnara Entities include the following:

| Entity | Registration Date | Registration State |
|---|---|---|
| Brugnara Corporation | November 19, 1992 | California |
| Brugnara Properties LP | April 30, 1997 | California |
| Brugnara Properties I LP ("BPI") | July 18, 1997 | California |
| Brugnara Properties II LP ("BPII") | July 18, 1997 | California |
| Brugnara Properties III | January 12, 1998 | California |
| Brugnara Properties IV LLC | August 2, 1999 | Nevada |
| Brugnara Properties V LLC ("BPV") | October 8, 1999 | Nevada |
| Brugnara Properties VI Inc. | October 8, 1999 | Nevada |
| Brugnara Properties VI Corporation ("BPVI") | April 19, 2000 | California |
| Brugnara Properties VII | July 6, 2006 | California |

(Exs. 32-34: Results from Business Entity Searches of the California and Nevada Secretary of State websites; Ex. 112: BPVI's Responses to Defendants' Requests for Admissions ("RFAs & Responses"), Request and Response No. 2.)

25. Luke claims he has been in full control of each of the Brugnara Entities at all times except during times when he has been incarcerated and Kay has been in control. (Ex. 101: L. Brugnara Depo. Tr., 250:22-25.) Kay admits that Luke was in full control of BPVI between

5

February 2012 and May 2014. (Ex. 111: BPVI 30(b)(6) Depo. Tr., 13:11-24.) Kay often defers to Luke for knowledge about BPVI's affairs. (Ex. 111: BPVI 30(b)(6) Depo. Tr., 22:8-13; 25:21-24; 26:3-15; 28:1-6; 44:17-20; 51:16-19; 68:14-24; 70:18-20; 85:10-19; 104:22-24.)

26.     In February 2003, in a petition filed in federal district court, Luke admitted that he was the alter ego of at least three of the Brugnara Entities; Brugnara Corporation, which he referred to as a "dba" for himself, BPI, and BPII. (Ex. 61: Petition to Quash Internal Revenue Summons, *Luke Brugnara dba Brugnara Corporation, et al. v. United States of America*, United States District Court for the Northern District of California, Case No. 3:03-cv-00932-JSW, Dkt No. 1, ¶ 3.)

27.     In February 2003, Brugnara Corporation was the general partner of BPI, and BPII. (*See* Ex. 35: Brugnara Corporation's Amended and Restated Articles of Incorporation dated July 1997; *see also* Ex. 36: Brugnara Corporation's Second Restated Articles of Incorporation dated February 7, 2003.) Between May 2000 and July 2006, BPI's general partners were comprised of only Brugnara Corporation and BPVI. (*See* Ex. 37: BPI's Amendment to Certificate of Limited Partnership dated May 16, 2000; Ex. 38: BPI's Restated Certificate of Limited Partnership dated July 6, 2006.) Since June 2000, BPII's general partners were comprised of only Brugnara Corporation and BPVI. (*See* Ex. 39: BPII's Amendment to Certificate of Limited Partnership dated June 1, 2000.)

28.     Between 1993 and 2002, Luke, through Brugnara Entities, purchased, sold, and otherwise transferred a number of multimillion dollar properties, realizing millions of dollars in gains. The table below identifies some of those properties and provides details for the transactions involving each property:

6

| Property | Titleholder | Purchase Date | Sale Date | Approximate Taxable Gain Personally realized by Luke |
|---|---|---|---|---|
| Market Street (a commercial office building located at 935-939 Market Street in San Francisco) | Brugnara Corp. | 5/7/1993 | 1/20/2000 | $6.5 million |
| 2nd Street (a commercial office building located at 171 2nd Street in San Francisco) | Brugnara Corp. | 6/15/1993 | 12/23/1999 | $3.7 million |
| Mission Street (a commercial office building located at 810-814 Mission Street in San Francisco) | Brugnara Corp. | 12/7/1993 | 1/5/2000 | $9.0 million |
| 38 San Jacinto (a residential house located at 38 San Jacinto Way in San Francisco) | Brugnara Corp. | 7/1/1994 | 7/3/2003 | $300,000 |
| 36 San Jacinto (a residential house located at 36 San Jacinto Way in San Francisco) | Brugnara Corp. | 11/17/1994 | 10/15/2002 | $440,000 |
| Post Street (a commercial office building located at 490 Post Street in San Francisco) | Brugnara Properties III | 1/27/1998 | 5/16/2001 | $21.5 million |
| Silver City (an 8-acre shopping center located at 3025 South Las Vegas Boulevard in Las Vegas) | BPV | 10/20/1999 | 5/1/2002 | $10.8 million |

Case: 17-03071   Doc# 91   Filed: 07/20/19   Entered: 07/22/19 11:58:45   Page 31 of 58
EXHIBIT A JOINT STATEMENT OF FACTS

(*See* Ex. 47: Declaration of Revenue Agent Charles Tonna ("Decl. of RA Tonna.), Schs. 2a-2g, *United States v. Brugnara*, United States District Court for the Northern District of California, Case No. 3:08-cr-0222 WHA, (the "USDC Tax Case"), Dkt. Nos. 110-3 - 110-5.) In February 2001, the principal of an accounting firm hired by Luke wrote a letter to Luke advising him, among other things, that his entities are required to timely file tax returns regardless of the amount of income or loss, and that a corporation's income, expenses, and other deductions may not be reported on a pass-through basis by its shareholders. (*See* Ex. 46: Declaration of Troy Crowther, ¶ 3, USDC Tax Case, Dkt. No. 110-2.) Luke responded to the letter from his accountant by requesting that the firm "delete" the letter from its computers. (*See id.*, ¶ 4.) Luke did not report the sale of the Post Street property on his 2001 tax return. (*See* Ex. 47: Decl. of RA Tonna, ¶ 11.) Luke's 2002 tax return failed to report a gain of over $10 million from the sale of the Silver City property. (*See id.*, ¶ 12.)

29.     On July 12, 2002, Luke, through BPV, purchased the property located at 224 Sea Cliff Avenue in San Francisco ("SeaCliff") — a seven-bedroom ocean-front house, and one of only seven houses on "billionaire's row" with its own private beach and cove in San Francisco. (Ex. 4: Grant Deed: Bonino Family Trust to BPV; Ex. 68: Declaration of Kay Brugnara dated May 5, 2018, ¶ 9, Current Bankruptcy Case, Dkt. No. 225.)

30.     On October 21, 2002, Luke transferred SeaCliff from BPV to another one of his entities and the plaintiff in this case, BPVI, who currently holds legal title to the property. (Ex. 7: Grant Deed: BPV to BPVI; Ex. 101: L. Brugnara Depo. Tr., 61:19-62:4; Ex. 112: RFAs & Responses, Request and Response Nos. 1, 31.)

**F.      Luke has been incarcerated for various periods of time since 2010.**

31.     On January 26, 2010, Luke pleaded guilty to willfully and knowingly filing false federal income-tax returns for the years 2000, 2001, and 2002. (Ex. 45: Hearing Transcript, pp. 39-40, USDC Tax Case, Dkt. No. 76; *see also* Ex. 44: Application for Permission to Enter Plea of Guilty and Order Accepting Plea, ¶ 5, USDC Tax Case, Dkt. No. 70.)

8

32. On May 28, 2010, the District Court for the Northern District of California sentenced Luke to 30 months in prison and one year of supervised release. (Ex. 49: Amended Judgment, pp. 2-3, USDC Tax Case, Dkt. No. 134.)

33. On May 28, 2014, while on supervised release, Luke was charged with mail fraud under 18 U.S.C. § 1341, and placed back into custody. (*See* Ex. 53: Criminal Complaint, *United States v. Brugnara*, United States District Court for the Northern District of California, Case No. 3:14-cr-00306 WHA (the "Mail Fraud Case"), Dkt. No. 1; Ex. 54: Minute Entry, Mail Fraud Case, Dkt. No. 5.)

34. In August, 2014, while he was waiting for trial on the mail fraud charge, Luke was transferred to a halfway house. (*See* Ex. 55: Minute Entry, Mail Fraud Case, Dkt. No. 94.)

35. Luke violated the conditions of his pretrial release, so on September 24, 2014, Luke was remanded back into the custody of U.S. Marshal. (*See* Ex. 56: Minute Entry, Mail Fraud Case, Dkt. No. 141.)

36. On or about February 5, 2015, while on furlough from custody to meet with his attorney, Luke escaped. (*See* Ex. 57: Bench Warrant and Revocation of Furlough Privileges, Mail Fraud Case, Dkt. No. 317.) Luke was later captured and remanded back into custody on February 12, 2015. (*See* Ex. 58: Minute Entry, Mail Fraud Case, Dkt. No. 321.)

37. On May 19, 2015, Luke was convicted of wire fraud, false declaration before a court, escape, and contempt. (Ex. 59: Minute Entry, Mail Fraud Case, Dkt. No. 791.)

38. Luke is currently serving an 84-month sentence at USP Beaumont. (*See* Ex. 52: Court Docket, Mail Fraud Case.)

## II. THE DEBTOR: BPVI

### A. Luke created BPVI in 2000, and appointed himself its sole shareholder and officer.

39. On April 19, 2000, Luke created and registered BPVI with the California Secretary of State. (Ex. 40: BPVI's Articles of Incorporation dated April 19, 2000 ("Articles of Incorporation"); Ex. 112: RFAs & Responses, Request and Response Nos. 2, 6.)

9

40.     BPVI's original Articles of Incorporation limited BPVI's purpose to "act[ing] as the General Partner of Brugnara Properties I, LP, and Brugnara Properties II, LP." (Ex. 40: Articles of Incorporation.) The Articles of Incorporation also required BPVI to have at least one independent director. (*See id.*)

41.     On July 25, 2000, BPVI filed its Restated Articles of Incorporation. (Ex. 41: BPVI's Restated Articles of Incorporation ("Restated Articles of Incorporation".) The Restated Articles of Incorporation made no changes to BPVI's purpose and continued to require at least one independent director. (*See id.*) Luke signed the Restated Articles of Incorporation as BPVI's president and secretary. (*See id.*)

42.     On February 7, 2003, BPVI filed its Second Restated Articles of Incorporation. (Ex. 42: BPVI's Second Restated Articles of Incorporation ("Second Restated Articles of Incorporation".) While BPVI's Second Restated Articles of Incorporation no longer required an independent director, they continued to limit BPVI's purpose to "act[ing] solely as the special purpose corporate General Partner of Brugnara Properties I, LP, and Brugnara Properties II, LP." (*See id.*) Luke signed the Second Restated Articles of Incorporation as BPVI's president and secretary. (*See id.*)

43.     On February 22, 2005, BPVI filed its third amended Articles of Incorporation. (Ex. 43: BPVI's Third Restated Articles of Incorporation ("Third Restated Articles of Incorporation".) According to the Third Restated Articles of Incorporation, BPVI's purpose is to "engage in any lawful act or activity" authorized by California's General Corporations Law. (*See id.; see also* Ex. 112:  RFAs & Responses, Request and Response No. 7.[2]) Luke signed the Third Restated Articles of Incorporation as BPVI's president and secretary. (*See id.*)

44.     BPVI's Articles of Incorporation authorized BPVI to issue 100 shares. (Ex. 40: Articles of Incorporation; Ex. 112:  RFAs & Responses, Request and Response Nos. 7, 13.[3])

---

[2] The numbering of the requests in Ex. 112:  RFAs & Responses mistakenly repeated the numbers 6 and 7.  This reference is to the second Request and Response No. 7 (p. 4: 16-20).

[3] The numbering of the requests in Ex. 112:  RFAs & Responses mistakenly repeated the numbers 6 and 7.  This reference is to the second Request and Response No. 7 (p. 4:16-20).

45. From the time he created BPVI until at least 2005, Luke was the sole owner of all 100 shares of BPVI. (Ex. 101: L. Brugnara Depo. Tr., 91:11-24.)

46. Luke did not contribute any money to BPVI to obtain his 100 shares of BPVI. (Ex. 101: L. Brugnara Depo. Tr., 319:15-19.)

47. Kay claims that Luke transferred all 100 shares of BPVI to her in 2005. (Ex. 100: K. Brugnara Depo. Tr., 24:21-25:5; *see also* Ex. 60: Declaration of Kay Brugnara in Support of Motion for Stay Pending Appeal dated May 11, 2018, ("May 11, 2018 Decl. of K. Brugnara"), *Brugnara v. United States Trustee*, United States District Court for the Northern District of California, Case No. 3:18-cv-02822 WHA ("Kay's Appeal"), Dkt. No. 3, ¶ 1.).

48. Kay admits that she did not pay any money in exchange for her BPVI shares. (Ex. 100: K. Brugnara Depo. Tr., 46:22-24.)

49. According to Kay, Luke kept possession of BPVI's share certificates after he transferred the shares to her. (Ex. 100: K. Brugnara Depo. Tr., 25:18-21.)

50. Kay does not know where her BPVI share certificates currently are. (Ex. 100: K. Brugnara Depo. Tr., 272:3-19.)

51. Since it was created, Luke and Kay have been BPVI's only shareholders, directors and officers. (Ex. 111: BPVI 30(b)(6) Depo. Tr., 34:1-5, 33:1-18; Ex. 112: RFAs & Responses, Request and Response Nos. 10-12.)

52. Since it was created, Luke and Kay have controlled BPVI. (Ex. 112: RFAs & Responses, Request and Response No. 98.)

53. From April 19, 2000 until January 2, 2010, Luke was BPVI's sole officer and director. (Ex. 111: BPVI 30(b)(6) Depo. Tr., 34:1-5.)

54. Luke and Kay have made contradictory statements about the identities of BPVI's officers and directors after January 2010:

    a.    On March 13, 2015, Luke filed a declaration in a previous BPVI bankruptcy case, claiming he was an "Officer of Brugnara Properties VI for the past 14 years" (that is, from 2000-2015). (Ex. 75: Declaration of Luke Brugnara in Opposition of Motion for Relief from the Automatic Stay of 11 U.S.C. ("2015 Decl. of Luke Brugnara"), ¶ 1, *In re BPVI.,* United States Bankruptcy Court for

11

the Northern District of California, Case No. 14-31867 DM ("2014 Bankruptcy Case"), Dkt. No. 23.)

b. On May 2018, Kay claimed that she has been the *sole* officer and director of BPVI since January 2, 2010. (Ex. 60: May 11, 2018 Decl. of K. Brugnara, ¶¶ 1, 4, 6, 7.)

c. At her August 2018 deposition, and at the 30(b)(6) deposition of BPVI (in November 2018), Kay claimed that she and Luke were co-presidents of BPVI between 2012 and 2014. (Ex. 100: K. Brugnara Depo. Tr., 17:24-19:1, 19:25-20:8; Ex. 111: BPVI 30(b)(6) Depo. Tr., 33:16-34:5.)

55. According to Kay, when she and Luke were co-presidents, Luke had primary control over BPVI, while Kay had a "much lesser involvement." (Ex. 100: K. Brugnara Depo. Tr. 19:25 – 20:8; 92:22-93:24.)

56. In November 2018, Kay was unsure of what positions she holds with BPVI because her position changes when Luke is not around. (Ex. 111: BPVI 30(b)(6) Depo. Tr., 33:1-10.)

57. According to Kay, Luke is no longer an officer of BPVI because he is currently unavailable due to his incarceration. (Ex. 111: BPVI 30(b)(6) Depo. Tr., 34:6-8.)

58. Luke testified that he expects to become president of BPVI when he is released from prison. (Ex. 101: L. Brugnara Depo. Tr., 220:19-24.)

**B. Luke and Kay do not follow any corporate formalities.**

59. Though BPVI was initially formed to be the managing partner of BPI, Kay does not know whether BPVI continues to be a managing partner of BPI. (*See* Ex. 40: Articles of Incorporation; Ex. 111: BPVI 30(b)(6) Depo. Tr., 26:3-11, Ex. 101: L. Brugnara Depo. Tr., 85:4-6.)

60. Kay did not review any of BPVI's corporate documents when she became its president in 2010. (Ex. 100: K. Brugnara Depo. Tr., 22:22-23:1.)

61. When Kay became president of BPVI in 2010, she did not know where BPVI's corporate records were kept and she did not have access to them. (*Id.*, 23:2-8.)

62. Throughout the course of the Current Bankruptcy Case and the instant adversary proceeding, BPVI has produced only two corporate documents: Corporate Resolution, dated January 2, 2010, appointing Kay as President of BPVI (the "January 2, 2010 Corporate

12

Resolution"), and Corporate Resolution to Borrow, dated July 5, 2013 and executed by Luke as

president of BPVI, authorizing BPVI to borrow $1.7 million from Saxe Mortgage Company (the

"July 5, 2013 Corporate Resolution"). (Ex. 116: January 2, 2010 Corporate Resolution; Ex. 100:

K. Brugnara Depo. Tr., 34:5-35:4; Ex. 117: July 5, 2013 Corporate Resolution; Ex. 100:

K. Brugnara Depo. Tr., 92:2-14; Ex. 112: RFAs & Responses, Request and Response Nos. 20,

62.)

      63.    Kay claims that she could not find BPVI's corporate records because they were either

nonexistent, lost, or destroyed. (Ex. 111: BPVI 30(b)(6) Depo. Tr., 118:3-119-11, 55:5-58:22.)

      64.    BPVI failed to produce any documents in response to the United States and FTB's

request for production of BPVI's financial statements, balance sheets, general ledgers, and other

documents relating to BPVI's financial affairs, claiming that these documents do not exist.

(Ex. 114: United States and FTB's Joint First Set of Requests for Production of Documents to

Plaintiff ("RPDs"), Request No. 7; Ex. 115: Responses to RPDs.)

      65.    BPVI's bylaws require regular meetings of the board of directors on the last Tuesday

of March of each year. (Ex. 121: By-Laws of BPVI ("Bylaws"), Old Republic Title Records,

Bates Nos. ORT1117014165_0011-12.) BPVI does not hold regular board of directors meetings

nor can it provide minutes for any board meetings. (Ex. 111: BPVI 30(b)(6) Depo. Tr., 58:23-

60:1.)

      66.    The Bylaws require regular annual meetings of shareholders on the last Tuesday of

March of each year. (Ex. 121: By-Laws, Old Republic Title Records, Bates Nos.

ORT1117014165_0016.) BPVI does not hold regular shareholder meetings nor can it provide

minutes for any shareholder meetings. (Ex. 101: L. Brugnara Depo. Tr., 129:19-130:12; Ex. 100:

K. Brugnara Depo. Tr., 257:6-13.)

      67.    BPVI does not have a corporate seal. (Ex. 111: BPVI 30(b)(6) Depo. Tr., 54:9-21.)

      68.    BPVI does not have a letterhead. (*Id.*, 54:22-55:2.)

**C. BPVI has no business purpose other than to hold title to the Brugnaras' personal residence.**

69. BPVI does not generate any income. (Ex. 111: BPVI 30(b)(6) Depo. Tr., 46:5-9; 49:1-6; Ex. 112: RFAs & Responses, Request and Response No. 66.)

70. Kay claims that BPVI is a "real-estate business." (Ex. 111: BPVI 30(b)(6) Depo. Tr., 44:12-16.) But in the nine years that Kay claims to have been BPVI's president (2010-2019), BPVI has not bought or sold or leased any property. (Ex. 111: BPVI 30(b)(6) Depo. Tr., 44:17-45:7; Ex. 112: RFAs & Responses, Request and Response Nos. 31, 34.)

71. According to Luke and Kay, BPVI has never had any assets other than SeaCliff. (Ex. 111: BPVI 30(b)(6) Depo. Tr., 69:4-20; Ex. 112: RFAs & Responses, Request and Response No. 78; *see also* Ex. 83, Declaration of Luke Brugnara dated July 30, 2009 ("2009 Decl. of Luke Brugnara"), ¶ 2, *In re BPVI,* United States Bankruptcy Court for the Northern District of California, Case No. 09-30038 DM ("2009 Bankruptcy Case"), Dkt. No. 34.)

72. Luke and Kay have not reported any assets, including SeaCliff, or any other buildings, land, or cash, nor any liabilities, such as any mortgages or outstanding loans, on the balance sheets attached to BPVI's federal tax returns. (*See* Ex. 112: RFAs & Responses, Request and Response Nos. 79-84, 104-110 referencing Attachments I-N (Exs. 151-156: BPVI's Forms 1120 for tax years 2005-2010); Exs. 157-159: BPVI's Forms 1120 for tax years 2012, 2013, 2016.)

73. In July 2009, Luke stated that BPVI had not engaged in any transactions other than its acquisition of title to SeaCliff. (*See* Ex. 83: 2009 Decl. of Luke Brugnara, ¶ 3.)

74. In July 2009, Luke also stated that BPVI had not made any distributions of assets, payments to creditors or transfers to him, his wife or any Brugnara entities. (*See id.*)

75. Kay's vision for BPVI as its president, is "to hold the property." (Ex. 111: BPVI 30(b)(6) Depo. Tr., 45:17-19.)

76. Kay claims that as compensation for her role as BPVI's president, she receives an annual "salary" of $200,000 from BPVI, payable in rent credit at SeaCliff. (*See* Ex. 116: January 2, 2010 Corporate Resolution; *see also* Ex. 111: BPVI 30(b)(6) Depo. Tr., 20:13-15.)

14

EXHIBIT A JOINT STATEMENT OF FACTS

77. Kay believes her duties as president of BPVI, which she describes as managing BPVI's litigation, maintaining SeaCliff, representing herself pro se in a personal lawsuit, taking care of her four children, and "doing every household duty … from shopping and cooking and cleaning" justify her "salary." (Ex. 100: K. Brugnara Depo. Tr., 273:20-274:15; *see also* Ex. 111: BPVI 30(b)(6) Depo. Tr., 22:18-24.)

78. It was Kay and Luke's idea for Kay to have a "lease agreement in lieu of compensation" for her services as BPVI's president. (Ex. 111: BPVI 30(b)(6) Depo. Tr., 20:14-21.) Kay did not negotiate with anyone on her compensation from BPVI. (Ex. 111: BPVI 30(b)(6) Depo. Tr., 20:22-22:24.)

79. BPVI has never had any employees. (*Id*., at 42:10-14.)

**D.** **Since 2009, BPVI has filed for bankruptcy protection four times.**

    **1.** **The 2009 Bankruptcy Case**

80. BPVI filed its first Chapter 11 bankruptcy on January 7, 2009. (Ex. 82: Petition with Statement of Financial Affairs, 2009 Bankruptcy Case, Dkt. No. 1.)

81. In its 2009 Statement of Financial Affairs, signed by Luke under penalty of perjury on January 6, 2009, BPVI did not disclose any revenue, salaries, compensation, or payments or transfers to any party, nor did it report the closure of any financial accounts within a year of filing its bankruptcy petition. (*Id.*)

82. BPVI's 2009 Statement of Financial Affairs lists Luke as its secretary, director, and 100% shareholder. (*See id*., p. 10.)

83. In its 2009 Bankruptcy Schedules, signed on January 6, 2009, by Luke, under penalty of perjury, BPVI claims the following:

    a.    BPVI has no checking, savings, or any other type of financial account or any cash on hand (Sched. B); and that

    b.    BPVI has no executory contracts or unexpired leases (Sched. G).

(*See id.*)

15

### 2. The 2010 Bankruptcy Case

84. BPVI filed its second Chapter 11 bankruptcy on September 17, 2010. (Ex. 78: Petition, *In re BPVI*, United States Bankruptcy Court for the Northern District of California, Case No. 10-33637 DM ("2010 Bankruptcy Case"), Dkt. No. 1.)

85. BPVI's attorney's fees for its 2010 Bankruptcy Case were paid by Brugnara Properties VII. (Ex. 80: Attorney's Amended Disclosure Statement, 2010 Bankruptcy Case, Dkt. No. 20.)

86. In its 2010 Statement of Financial Affairs, signed by Kay under penalty of perjury on October 18, 2010, BPVI did not disclose any revenue, salaries, compensation, or payments or transfers to any party, nor did it report the closure of any financial accounts within a year of filing its bankruptcy petition. (Ex. 79: Statement of Financial Affairs and Bankruptcy Schedules, 2010 Bankruptcy Case, Dkt. No. 14.)

87. In its 2010 Bankruptcy Schedules, signed on October 18, 2010, by Kay, under penalty of perjury, BPVI claims the following:

> a. BPVI has no checking, savings, or any other type of financial account or any cash on hand (Sched. B); and that
>
> b. BPVI has no executory contracts or unexpired leases (Sched. G).

(*Id.*)

### 3. The 2014 Bankruptcy Case

88. BPVI filed its third Chapter 11 bankruptcy on December 31, 2014. (Ex. 73: Petition, 2014 Bankruptcy Case, Dkt. No. 1.)

89. In its 2014 Statement of Financial Affairs, signed by Luke under penalty of perjury on January 26, 2015, BPVI did not disclose any revenue, salaries, compensation, or payments or transfers to any party, nor did it report the closure of any financial accounts within a year of filing its bankruptcy petition. (Ex. 74: Statement of Financial Affairs and Bankruptcy Schedules, 2014 Bankruptcy Case, Dkt. No. 16.)

90. BPVI's 2014 Statement of Financial Affairs lists Luke as its president and sole officer, and Kay as its sole shareholder. (*See id.*, p. 9.)

16

1    91.    BPVI's 2014 Statement of Financial Affairs also states that no officer's or director's

2  relationship was terminated within one year of its filing of its bankruptcy petition. (*See id.*, p. 10.)

3    92.    In its 2014 Bankruptcy Schedules, signed by Luke under penalty of perjury on

4  January 27, 2014, BPVI claims the following:

5        a.    BPVI has no checking, savings, or any other type of financial
             account or any cash on hand (Sched. B); and that

6

7        b.    BPVI has no executory contracts or unexpired leases (Sched. G).

8  (Ex. 74: Statement of Financial Affairs and Bankruptcy Schedules, 2014 Bankruptcy Case, Dkt.

9  No. 16.)

10            **4.    The Current Bankruptcy Case**

11    93.    BPVI filed its fourth, and current, Chapter 11 bankruptcy on May 22, 2017. (Ex. 62:

12  Petition, Current Bankruptcy Case, Dkt. No. 1.)

13    94.    In its Current Bankruptcy Case Statement of Financial Affairs, signed by Kay under

14  penalty of perjury on June 19, 2017, BPVI claims the following:

15        a.    BPVI has no revenue (p. 1);

16        b.    BPVI has had no payments or transfers to creditors within 90 days
             of filing its bankruptcy petition (p. 1);

17

18        c.    BPVI has had no transfers of property made within 1 year before
             filing the petition that benefited any insider (p. 1);

19        d.    BPVI has not made any gifts or charitable contributions in the
             aggregate amount of over $1000 to any recipient (p. 2);

20

21        e.    BPVI's $50,000 attorney retainer associated with filing the
             bankruptcy case was paid by PSG Capital (p. 3);

22        f.    BPVI made no transfers of money or other property to any person
             within 2 years of filing its bankruptcy petition (p. 3); and

23

24        g.    BPVI did not provide any insider any value in any form, including
             salary, other compensation, draws, bonuses, or loans within 1 year
             before filing its bankruptcy petition (p. 6).

25

26  (Ex. 64: Statement of Financial Affairs, Current Bankruptcy Case, Dkt. No. 22.)

27    95.    In its Current Bankruptcy Case Schedules, signed on June 19, 2017, by Kay, under

28  penalty of perjury, BPVI claims the following:

17

EXHIBIT A JOINT STATEMENT OF FACTS

a.  Other than $100 at US Bank, BPVI has no other cash, cash equivalents, or financial assets (p. 6); and that

b.  BPVI has no executory contracts or unexpired leases (p. 11).

(Ex. 63: Bankruptcy Schedules, Current Bankruptcy Case, Dkt. No. 21.)

**E.   BPVI has never had a legitimate bank account.**

96.   Before 2009, payments to vendors and lenders secured by SeaCliff came from a checking account at Wells Fargo Bank, titled in the name of Brugnara Corporation. (*See* Ex. 84: Petition with Bankruptcy Schedules and Statement of Financial Affairs, *In re Brugnara Corporation*, United States Bankruptcy Court for the Northern District of California, Case No. 09-30041 DM ("2009 Brugnara Corporation Bankruptcy Case"), Dkt. No. 1, attachment to Statement of Financial Affairs.) That single checking account was also used for deposits of rental income from BPI's commercial property, payments to vendors and lenders secured by BPI's commercial property, and payments for expenses "for the support, primarily living expenses, of Luke Brugnara and his family (Luke Brugnara and Kay Brugnara are also guarantors of the junior secured debt on Brugnara Corporation's property)." (*Id.*)

97.   In a declaration filed in the 2009 Bankruptcy Case, Luke stated that BPVI has never had a bank account. (Ex. 83: 2009 Decl. of Luke Brugnara, ¶ 2.)

98.   Kay does not know if BPVI had a bank account in 2010 when she became BPVI's president. (Ex. 100: K. Brugnara Depo. Tr., 35:17-20.)

99.   At her August 1, 2018, deposition, Kay testified that the only BPVI bank account she is aware of is a debtor-in-possession account at Wells Fargo Bank that was opened pursuant to the 2010 Bankruptcy Case. (*Id.*, 54:2-6.)

100.  But confronted with an account application for a BPVI checking account at Wells Fargo Bank (account no. XXXXXX0174) that was opened in July 2013 ("Wells Fargo Checking Account X0174"), Kay admitted to opening that account on BPVI's behalf. (*Id.*, 55:8-17.)

101.  Kay testified that she would have opened Wells Fargo Checking Account X0174 at the direction of Luke because he was in charge of BPVI's finances at that time. (*Id.*, 55:18-21.)

18

102. In 2013, Kay, at Luke's direction, withdrew over $267,000 from Wells Fargo Checking Account X0174. (*Id.*, 70:4-71:3, 72:18-74:12; *see also* Ex. 125: Wells Fargo Bank Records, Bates No. WF_0086.)

103. Since 2010, BPVI has had numerous bank accounts, including:

| Financial Institution | Account Type | Partial Acct. No. | Date Opened |
|---|---|---|---|
| Wells Fargo | Checking | XXXXXX0174 | 7/16/2013 |
| Wells Fargo | Savings | XXXXXX6108 | 7/16/2013 |
| Wells Fargo | Checking (DIP) | XXXXXX6852 | 3/5/2015 |
| Wells Fargo | Savings | XXXXXX0021 | 3/5/2015 |
| Wells Fargo | Checking | XXXXXX4302 | 4/5/2016 |
| JPMorgan Chase | Checking | XXXXXX5819 | 7/23/2015 |
| US Bank | Checking (DIP) | X4598 | 2017 |

(Ex. 125: Wells Fargo Bank Records, Bates Nos. WF_0067-71, WF_0009-13, WF_0025-28; Ex. 120: JPMorgan Chase Bank Records ("JPMC Records"), Bates No. JPMC2_0118; Ex. 63: Bankruptcy Schedules, Current Bankruptcy Case, Dkt. No. 21.)

104. The Brugnaras have treated the Wells Fargo and JP Morgan Chase bank accounts listed above as their personal bank accounts. For example:

    a.    On July 19, 2013, Old Republic Title wired the cash proceeds of SeaCliff's refinance, in the amount of approximately $267,000, into Wells Fargo Checking Account X0174. Three days later, on July 22, 2013, Kay withdrew almost the entire amount in cash. (Ex. 100: K. Brugnara Depo. Tr., 72:18-20; *see also* Ex. 125: Wells Fargo Bank Records, Bates No. WF_0086; Ex. 103: Amended Borrower's Closing Statement – Saxe Mortgage.)

    b.    On July 23, 2015, Kay deposited the cash proceeds of another refinance of SeaCliff, over $57,000 paid by check, into BPVI's checking account at JPMorgan Chase. (Ex. 120: JMPC Records, Bates Nos. JPMC2_0007, JPMC2_0022-23.) The next day, on July 24, 2015, Kay withdrew $41,739.93 in cash from that account. (Ex. 120: JPMC Records, Bates No. JPMC2_0007; Ex. 111: BPVI 30(b)(6) Depo. Tr., 120:10-122:9.) On that same day, at Kay's request, Kay's son, Luke II deposited $41,739.93 into his personal bank account at JPMorgan. (Ex. 111: BPVI 30(b)(6) Depo. Tr., 125:12-126:11; Ex. 120: JPMC Records, Bates No. JPMC2_0228.)

    c.    Between March 26, 2016 and June 19, 2017, Kay deposited and then withdrew—either in cash or through debit card charges— over $140,000 from the BPVI checking account at JPMorgan Chase.

19

(Ex. 120: JPMC Records, Bates Nos. JPMC2_0051-54, JPMC2_0065-66, JPMC2_0073-88, JPMC2_0100-107; Ex. 111: BPVI 30(b)(6) Depo. Tr., 130:19-24; 134:23-135:1; 137:3-140:7; 140:12-143:20; 146:24-154:11; 154:23-160:24; 161:1-163:13; 169:2-170:6; 171:1-173:4.)

d. The withdrawals from BPVI's account in 2016-2017 include large cash withdrawals and debit-card charges of approximately $20,000 paid to a dentist, **$6,000 for down payment on a car for Kay, and purchases at Nordstrom and Best Buy.** (*See id.;* Ex. 111: BPVI 30(b)(6) Depo. Tr., 130:19-24; 134:23-135:1; 137:3-140:7; 140:12-143:20; 146:24-154:11; 154:23-160:24; 161:1-163:13; 169:2-170:6; 171:1-173:4.)

e. On May 23 and 24, 2017, just days after BPVI filed for bankruptcy, Kay used BPVI's debit card to pay over $600 for herself and her daughters to stay at the Hyatt Vineyard Creek in Santa Rosa. (Ex. 111: BPVI 30(b)(6) Depo. Tr., 163:5-12; 165:21-167:22; *see also* Ex. 120: JPMC Records, Bates No. JPMC2_100.)

f. On May 24, 2017, Kay also withdrew $9,500 in cash from BPVI's checking account at JPMorgan Chase. (Ex. 120: JPMC Records, Bates No. JPMC2_0101.)

g. And on June 14, 15, and 19, 2017, just days before signing and filing BPVI's Statement of Financial Affairs and Bankruptcy Schedules, stating that BPVI had not made any transfers of property to any insider, Kay withdrew over $25,000 from BPVI's checking account at JPMorgan Chase. (Ex. 120: JPMC Records, Bates No. JPMC2_0105.)

h. In February 2017, Kay deposited into BPVI's bank account a check for $4,432, payable to her personally, for settlement of a lawsuit involving her daughter. (Ex. 120: JPMC Records, Bates Nos. JPMC2_0085-88; *see also* Ex. 111: BPVI 30(b)(6) Depo. Tr., 130:19-24; 155:12-156:15; 158:14-160:14.)

105. Kay has been the only authorized signer on the BPVI checking account at JPMorgan Chase. (Ex. 111: 30(b)(6) Depo. Tr., 61:19-22; 120:2-5.)

106. Luke and Kay have not had bank accounts in their names for "many, many years." (Ex. 100: K. Brugnara Depo. Tr., 151:19-24; Ex. 101: L. Brugnara Depo. Tr., 197:4-23.)

107. With the exception of the checking account at US Bank (account no. X4598), Luke and Kay did not disclose the existence of any of the other BPVI bank accounts on BPVI's 2014 Bankruptcy Case and Current Bankruptcy Case schedules. (Ex. 74: Statement of Financial Affairs and Bankruptcy Schedules, 2014 Bankruptcy Case, Dkt. No. 16; Ex. 63: Bankruptcy Schedules, Current Bankruptcy Case, Dkt. No. 21.)

20

Case: 17-03071    Doc# 91    Filed: 07/20/19    Entered: 07/22/19 11:58:45    Page 44 of 58

108. In October and November 2018, when the United States issued subpoenas to Wells Fargo and JPMorgan Chase to obtain bank records relating to BPVI, the Brugnaras filed motions to quash the United States' subpoenas. (*See* Dkt. Nos. 35, 36, 42, 45, 49.)

**F. BPVI has filed tax returns only when required to do so for bankruptcy or financing purposes.**

109. During discovery in this adversary proceeding, the United States and FTB requested BPVI's tax returns, but BPVI did not produce any federal or state tax returns. (Ex. 114: RPDs, Request No. 3; Ex. 115: BPVI's Responses to RPDs.)

110. BPVI has only filed the following tax returns:[4]

| Return Type | Tax year(s) | Return Date | Corresponding BPVI Event |
| --- | --- | --- | --- |
| IRS Form 1120 | 2005-2010 | 7/4/2011 | On June 3, 2011, the bankruptcy court, in BPVI's 2010 Bankruptcy Case, ordered BPVI to be current on its tax returns by 7/8/2011. |
| IRS Form 1120 | 2012-2013 | 3/1/2015 | In March 2015, BPVI was in the midst of its 2014 Bankruptcy Case. Kay filed a declaration on March 4, 2015, claiming that she had filed BPVI's federal tax returns. |
| IRS Form 1120 | 2016 | 5/22/2017 | BPVI filed its Current Bankruptcy on May 22, 2017. |
| CA Form 100 | 2008-2010 | 7/4/2011 | On June 3, 2011, the bankruptcy court, in BPVI's 2010 Bankruptcy Case, ordered BPVI to be current on its tax returns by 7/8/2011. |
| CA Form 100 | 2011-2012 | 7/9/2013 | In July 2013, Luke caused BPVI to pledge SeaCliff as collateral for a $1.7 million loan from Saxe Mortgage Company to BPVI. |
| CA Form 100 | 2015-2016 | 5/22/2017 | BPVI filed its Current Bankruptcy on May 22, 2017. |

---

[4] The Chapter 7 Trustee in the Current Bankruptcy Case may have filed 2017 and/or 2018 tax returns for BPVI. The statement in ¶ 110 does not pertain to 2017 and/or 2018 tax returns, if they were filed by the Chapter 7 Trustee.

21

1  (*See* Ex. 112: RFAs & Responses, Request and Response Nos. 79-84, 104-110 referencing

2  Attachments I-N (Exs. 151 – 156: BPVI's Forms 1120 for tax years 2005-2010); Exs. 157 – 159:

3  BPVI's Forms 1120 for tax years 2012, 2013, 2016; Ex. 118: RFA2 and Responses thereto,

4  Request Nos. 104-110 referencing Attachments O-U (Exs. 160 – 166: BPVI's Forms 100 for tax

5  years 2008-2012, 2015, 2016); *see also* Ex. 77: Court Docket, 2010 Bankruptcy Case; Ex. 62:

6  Petition, Current Bankruptcy Case, Dkt. No. 1; Ex. 25: Deed of Trust, BPVI to Saxe Mortgage

7  Company; Ex. 76: Declaration of Kay Brugnara dated March 4, 2015, ¶ 9, 2014 Bankruptcy Case,

8  Dkt. No. 24.)

9       111.  BPVI's federal tax returns have not disclosed any income, expenses, paid-in capital,

10  loans from shareholders, or distributions.[5] (Ex. 100: K. Brugnara Depo. Tr., 111:21-112:7; 113:7-

11  19; 114:21-115:19; 117:13-25; Ex. 112: RFAs & Responses, Request and Response Nos. 79-84,

12  104-110 referencing Attachments I-N (Exs. 151 – 156: BPVI's Forms 1120 for tax years 2005-

13  2010); Exs. 157 – 159: BPVI's Forms 1120 for tax years 2012, 2013, 2016.)

14       112.  BPVI has never filed an employment tax return, nor has it ever reported any

15  employee or officer compensation. (*See id.*; Ex. 111: BPVI 30(b)(6) Depo. Tr., 22:4-10.)

16       113.  BPVI's California corporate income tax returns for tax years 2008-2012, 2015, and

17  2016, did not disclose any income, expense, receipts, or distributions.[6] (*See* Ex. 118: RFA2 and

18  Responses thereto, Request Nos. 104-110 referencing Attachments O-U (Exs. 160 – 166: BPVI's

19  Forms 100 for tax years 2008-2012, 2015, 2016.))

20

21

22

23

24      [5] The Chapter 7 Trustee in the pending bankruptcy case may have filed 2017 and/or 2018

25  Forms 1120 for BPVI. This statement does not pertain to tax returns for tax years 2017 and/or 2018, if one was filed by the Chapter 7 Trustee.

26      [6] The Chapter 7 Trustee in the pending bankruptcy case may have filed 2017 and/or 2018

27  Forms 100 for BPVI. This statement does not pertain to tax returns for tax years 2017 and/or 2018, if one was filed by the Chapter 7 Trustee.

28

### III. THE SEACLIFF PROPERTY

#### A. Luke and Kay used Brugnara Entities to purchase and hold title to SeaCliff.

114. Luke purchased the SeaCliff property from the Bonino family on July 12, 2002, for $8 million. (Ex. 101: L. Brugnara Depo. Tr., 52:3-54:11.) The Boninos' deed transferred SeaCliff to Brugnara Properties V, LLC ("BPV"). (Ex. 4: Grant Deed: Bonino Family Trust to BPV.)

115. On July 16, 2002, Luke signed a deed of trust stating that BPV on that date had borrowed $8.8 from Vestin Mortgage ("Vestin") "for construction and other purposes." (Ex. 5: Deed of Trust, BPV to Vestin.) As security for this loan, BPV, also on July 16, 2002, gave Vestin a deed of trust pledging SeaCliff's real property and fixtures. (*See id.*) The Vestin deed of trust prohibited BPV from selling, conveying, transferring, assigning, disposing, or further encumbering SeaCliff prior to its release from the deed of trust. (*See id.*, §§ 2.9, 2.18.1, 3.1.3.)

116. On September 13, 2002, Vestin reconveyed SeaCliff back to BPV. (*See* Ex. 6: Partial Reconveyance.) The reconveyance was titled "partial" reconveyance because Vestin's deed of trust encumbered SeaCliff's real property *and* its fixtures, and Vestin was retaining its deed of trust on SeaCliff's fixtures. (*See* Ex. 5: Deed of Trust, BPV to Vestin; Ex. 6: Partial Reconveyance.)

117. On October 21, 2002, Luke signed a deed that transferred SeaCliff from BPV to BPVI. (Ex. 7: Grant Deed, BPV to BPVI; Ex. 101: L. Brugnara Depo. Tr., 61:19-62:4.)

118. No money was exchanged between BPV and BPVI, and no transfer taxes were paid as a result of this transfer. (Ex. 7: Grant Deed, BPV to BPVI; Ex. 101: L. Brugnara Depo. Tr., 63:20-65:8; 313:314:5.)

119. At the time of the transfer, SeaCliff was not listed for sale, and there is no evidence that SeaCliff was appraised. (Ex. 101: L. Brugnara Depo. Tr., 66:2-12; Ex. 112: RFAs & Responses, Request No. 30; Ex. 113: United States' First Set of Requests for Interrogatories to BPVI ("USA's Rogs"), Interrogatory No. 1, and BPVI's Responses to USA's Rogs, Response to Interrogatory No. 1, referencing Defendants' RFA No. 30.)

1      120.  Luke believes that SeaCliff has always been worth at least as much, or more than, the

2   amount of the encumbrances against it. (Ex. 101: L. Brugnara Depo. Tr., 64:11-16; 79:2-14;

3   101:19-102:7; 280:23-281:6; 313:9-23.)

4      121.  In May 2012, Luke stated, "the Brugnara Properties VI entity . . . merely holds title to

5   [SeaCliff]." (Ex. 126: Wells Fargo Bank's production in response to a Subpoena to Produce

6   Documents ("Wells Fargo Loan Records"), directed to Wells Fargo Bank to produce records

7   related to a Wells Fargo Loan to BPVI secured by SeaCliff; Ex. 101: L. Brugnara Depo. Tr.,

8   190:17-191:16.)

9      122.  Luke also stated, "Luke Brugnara's income has ALWAYS been the determinate of

10  the underwriting [of a loan secured by SeaCliff], not Brugnara Properties VI." (Ex. 126: Wells

11  Fargo Loan Documents, emphasis in original; Ex. 101: L. Brugnara Depo. Tr., 190:17-191:16.)

12     123.  Kay believes that SeaCliff is worth more than $25 million, and that the value of

13  SeaCliff has appreciated since its purchase. (Ex. 100: K. Brugnara Depo. Tr., 192:22-193:17;

14  196:20-197:16; 201:1-8, Ex. 111: BPVI 30(b)(6) Depo. Tr., 91:8-11.; Ex. 115: BPVI's Responses

15  to RPDs, including email message from Kay to appraiser Dave Wallace, dated June 12, 2015 at

16  3:57 p.m.)

17     124.  In November 2017, Wallace and Associates appraised SeaCliff at $20 million.

18  (Ex. 66: Appraisal attached to BPVI's Plan and Disclosure Statement, Current Bankruptcy Case,

19  Dkt. No. 95, pp. 18-34.)

20     125.  The Brugnaras moved into SeaCliff shortly after they purchased it in 2002 and they

21  have continued to live there since then. (Ex. 100: K. Brugnara Depo. Tr., 29:18-19; Ex. 60: May

22  11, 2018 Decl. of Kay Brugnara, ¶ 8; Ex. 112: RFAs & Responses, Request and Response

23  Nos. 92, 93.)

24     126.  Since the 2002 acquisition, no one other than the Brugnaras has lived at SeaCliff.

25  (Ex. 111: BPVI 30(b)(6) Depo. Tr., 75:7-10.)

26     127.  BPVI has never tried to lease SeaCliff to anyone other than a Brugnara.  (*Id.*, 75:11-

27  14; Ex. 112: RFAs & Responses, Response to Request Nos. 31, 34, 102.)

28

EXHIBIT A JOINT STATEMENT OF FACTS

128. From at least December 2, 2008 until January 5, 2015, SeaCliff's PG&E account was in the name of BPI. (*See* Ex. 122: PG&E Records, p. 4.)

129. SeaCliff's water and sewer account is in Luke Brugnara's name. (*See* Ex. 123: San Francisco Public Utilities Commission Documents, Bates Nos. SFPUC00002, SFPUC00008, SFPUC00014, SFPUC00020, SFPUC00030, SFPUC00058, SFPUC00073, SFPUC00098, SFPUC00112.)

**B.    While SeaCliff has appreciated in value, Luke and Kay have consistently used the increased equity for their personal benefit without reporting any income, compensation, gains or distributions.**

130. Since its inception, BPVI has never reported any income, gains, distributions, or asset transfers on its tax returns or bankruptcy schedules. (*See* above ¶¶ 81, 86, 89, 94, 111, 113.)

**1.    Luke and Kay used equity from SeaCliff to pay $425,000 to Suerte Holdings to satisfy a personal judgment.**

131. In February 2007, the Santa Clara County Superior Court entered judgment in the amount of $355,237.02 in favor of mortgage broker Investment Grade Loans against Brugnara Corporation for failure to make payments on a mortgage note made by Brugnara Corporation, and against Luke Brugnara and Kay Brugnara as guarantors of that note ("IGL Judgment"). (Ex. 98: Judgment, *Investment Grade Loans v. Luke Brugnara, Kay Brugnara, and Brugnara Corporation*, Santa Clara Superior Court, Case No. 104CV020232 (the "Santa Clara State Court Case"); Ex. 100: K. Brugnara Depo. Tr., 14:7-15:14.)

132. Investment Grade Loans subsequently assigned its judgment to Suerte Holdings, LLC ("Suerte"). (Ex. 124: Suerte's production in response to the Subpoena to Produce Documents ("Suerte Records"), including Settlement Agreement and Mutual Release, ¶ 4.)

133. In December 2015, Kay agreed to a settlement with Suerte. (Ex. 124: Suerte Records, including Settlement Agreement; *see also* Ex. 111: BPVI 30(b)(6) Depo. Tr., 116:8-117:2.)

134. As part of the settlement, Kay promised to pay $425,000 and caused BPVI to pledge SeaCliff to Suerte as collateral to secure Kay's performance. (Ex. 28: Deed of Trust, BPVI to Suerte; Ex. 124: Suerte Records, including Settlement Agreement; *see also* Ex. 111: BPVI 30(b)(6) Depo. Tr., 116:8-117:2.) Kay also agreed to allow Suerte to seek an order from the Santa

Clara County Superior Court to amend the IGL Judgment to add BPVI as an additional judgment debtor. (Ex. 124: Suerte Reccords, including Settlement Agreement, ¶ 4(b)(iv).)

135.   In December 2015, Suerte brought a motion to add BPVI to the IGL Judgment as a judgment debtor. (Ex. 99:  Motion for Order Adding BPVI to Judgment as Judgment Debtor, Santa Clara State Court Case.) The basis for Suerte's motion was that BPVI is the alter ego of Luke and/or Kay and/or Brugnara Corporation. (*See id*.)[7]

136.   In November 2016, Kay caused BPVI to pledge SeaCliff and borrow $1.5 million from PSG Capital Partners ("PSG"). (Ex. 100:  K. Brugnara Depo. Tr., 210:4-211:1; 211:17-20; Ex. 29:  Deed of Trust, BPVI to PSG.) Kay then used $425,000 from the PSG loan proceeds to pay Suerte and satisfy the IGL Judgment. (Ex. 100:  K. Brugnara Depo. Tr., 210:4-211:1; 211:17-20.)

### 2.   Luke and Kay used equity from SeaCliff to post bond for Luke's release from federal custody.

137.   On May 26, 2010, Luke and Kay offered SeaCliff as collateral for a $1 million criminal bond to secure Luke's release from custody pending sentencing in a criminal tax case. (*See* Ex. 48: Minute Entry, USDC Tax Case, Dkt. No. 128.)

138.   In August 2014, Luke and Kay again offered SeaCliff as collateral for a $500,000 criminal bond to secure Luke's release from custody pending sentencing related to two federal criminal cases then pending against him: United States District Court case nos. 14-cr-00306 and 08-cr-00222. (*See* Ex. 50:  Minute Entry, USDC Tax Case, Dkt. No. 334, Ex. 51:  Transcript of Proceedings, USDC Tax Case, Dkt. No. 364.) On August 25, 2014, the United States District Court recorded a deed of trust, executed by Luke and Kay, against SeaCliff. (Ex. 26: Short Form Deed of Trust, BPVI to United States District Court.)

---

[7] In May 2016, the Santa Clara Superior Court denied Suerte's motion to amend the IGL Judgment to add BPVI as a corporate judgment debtor because it was not a party to that action. (See Minute Order dated May 5, 2016, attached to BPVI's Request for Judicial Notice.)

26

### 3. Luke and Kay used SeaCliff as collateral for loans benefitting the Brugnara Entities

139. In November 2002, Luke caused BPVI to pledge SeaCliff as collateral for a $29 million loan "for construction and other purposes" from Vestin, by cross-collateralizing SeaCliff with 351 California Street — a property that was titled in the name of BPI — and 201 Sansome Street — a property that was titled in the name of BPII. (Ex. 8: Deed of Trust, executed by Luke on behalf of BPI, BPII, and BPVI.) There is no evidence that BPVI received any of the loan proceeds or received any compensation for the SeaCliff pledge. And the Brugnaras have never "done renovations" at SeaCliff. (Ex. 111: BPVI 30(b)(6) Depo. Tr., 80:15-22.) **The only major construction to SeaCliff between 2002 to 2016 was work related to building a concrete deck and stairway in October 2002. (Ex. 104: Excerpts from the Transcript of Deposition of Matthew Huey ("Huey Depo. Tr."), 26:18-29:15; see also Ex. 111: BPVI 30(b)(6) Depo. Tr., 68:15-22, 89:13-90:4.) The Brugnaras paid MH Construction approximately $250,000 for building the deck and stairway. (See Huey Depo. Tr., 26:18-29:15.)**

140. In May 2003, Luke and Kay modified the $29 million Vestin loan and took out an additional $1.1 million, secured by an existing first position deed of trust and a new second position deed of trust against SeaCliff. (Ex. 9: First Loan Modification Agreement with Vestin.) Luke and Kay personally guaranteed the modified Vestin loan. (*Id.*)

141. In March 2004, Luke caused BPVI to pledge SeaCliff as collateral for a $1.15 million loan from David Pick Family Partnership LP, by cross-collateralizing SeaCliff with 351 California Street — titled in the name of BPI — and 201 Sansome Street—titled in the name of BPII. (Ex. 11: March 2004 Deed of Trust, executed by Luke on behalf of BPI, BPII, and BPVI.)

142. In August 2004, Luke caused BPVI to pledge SeaCliff as collateral for a $16 million loan from Imperial Capital Bank to BPI. (Ex. 12: Deed of Trust, BPVI to Imperial Capital Bank.)

143. In August 2004, Luke caused BPVI to pledge SeaCliff as collateral for a $6 million from David Pick Family Partnership LP, by cross-collateralizing SeaCliff with 351 California Street—titled in the name of BPI — and 4850 Redwood Retreat — titled in the name of Brugnara

Corporation. (Ex. 13: Deed of Trust, executed by Luke on behalf of BPI, BPII, and BPVI, to David Pick Family Partnership LP.)

144. In February 2005, Luke caused BPVI to pledge SeaCliff as collateral for a $2 million loan from CMR Mortgage Fund, LLC to Brugnara Corporation and BPVI. (Ex. 15: Deed of Trust, BPVI to CMR Mortgage Fund, LLC.)

145. In May 2005, Luke caused BPVI to pledge SeaCliff as collateral for a $1.85 million loan from David Pick to Brugnara Corporation and BPVI, by cross-collateralizing SeaCliff with 4850 Redwood Retreat — titled in the name of Brugnara Corporation. (Ex. 16: Deed of Trust, executed by Luke on behalf of Brugnara Corporation and BPVI to David Pick.)

146. In November 2005, Luke caused BPVI to pledge SeaCliff as collateral for a $5 million loan from CMR Mortgage Fund, LLC to Brugnara Corporation, by cross-collateralizing SeaCliff with 351 California Street — titled in the name of BPI — 201 Sansome Street — titled in the name of BPII — and a property in Nevada. (Ex. 17: Deed of Trust, BPVI to CMR Mortgage Fund, LLC.) The November 2005 note was personally guaranteed by Luke and Kay. (*See id.*, § 1.7.)

147. In September 2006, Luke caused BPVI to pledge SeaCliff as collateral for a $2 million loan from CMR Mortgage Fund II, LLC to BPI. (Ex. 19: Deed of Trust, BPVI to CMR Mortgage Fund II, LLC.)

148. In February 2007, Luke caused BPVI to pledge SeaCliff as collateral for a $4 million loan from CMR Mortgage Fund II, LLC to BPI. (Ex. 20: Deed of Trust, BPVI to CMR Mortgage Fund II, LLC.)

149. In March 2008, Luke caused BPVI to pledge SeaCliff as collateral for a $11.35 million loan from Jorei Enterprises ("Jorei") to BPI. (Ex. 24: Deed of Trust, BPVI to Jorei.)

> **4.** **While living there rent-free, Luke and Kay used SeaCliff's equity to pay its mortgage, taxes, insurance premiums, and their personal living expenses.**

150. In October 2003, Luke caused BPVI to pledge SeaCliff as collateral for a $1.5 million loan with California Trust Deeds. (Ex. 10: Deed of Trust, BPVI to California Trust Deeds.)

151. In August 2004, Luke caused BPVI to pledge SeaCliff as collateral for a $4.08 million loan with California Trust Deeds. (Ex. 14: Deed of Trust, BPVI to California Trust Deeds.)

152. In July 2006, Luke caused BPVI to pledge SeaCliff as collateral for a $1.15 million loan from David Pick. (Ex. 18: Deed of Trust, BPVI to David Pick.)

153. In April 2007, Luke caused BPVI to pledge SeaCliff as collateral for a $6 million loan from World Savings Bank to BPVI. (Ex. 21: Deed of Trust, BPVI to World Savings Bank.) The World Savings Bank loan has since been transferred to Wells Fargo Bank. (*See* Ex. 101: L. Brugnara Depo. Tr., 59:15-24.)

154. In April 2007, Luke caused BPVI to pledge SeaCliff as collateral for a $1.15 million loan from David Pick. (Ex. 22: Deed of Trust, BPVI to David Pick.)

155. In May 2007, Luke caused BPVI to pledge SeaCliff as collateral for a $450,000 loan from David Pick Family Trust. (Ex. 23: Deed of Trust, BPVI to David Pick Family Trust.)

156. In June 2013, Luke caused BPVI to pledge SeaCliff as collateral for a $1.7 million loan from Saxe Mortgage Company to BPVI. (Ex. 25: Deed of Trust, BPVI to Saxe Mortgage Company.) The Brugnaras claim they used part of the proceeds from the Saxe loan to bring the Wells Fargo mortgage current, pay the rent on a house for Kay and the children in Marin County, and pay SeaCliff's delinquent property taxes. (Ex. 101: L. Brugnara Depo. Tr., 161:24-162:4; 157:25-158:14; Ex. 100: K. Brugnara Depo. Tr., 66:8-15.)

157. In July 2015, Kay caused BPVI to pledge SeaCliff as collateral for a $1.2 million loan from Dakota Note. (Ex. 27: Deed of Trust, BPVI to Dakota Note.) In November 2016, Kay received an additional cash disbursement of $1.5 million from PSG. (Ex. 29: Deed of Trust, BPVI to PSG.) Kay claims she used the proceeds of the Dakota Note and PSG loans to bring current the arrears on the Wells Fargo and Saxe mortgages, and to pay for SeaCliff's insurance, "operating expenses, maintenance on [SeaCliff]," utilities, a gardener, and "everything that comes along trying to run the property." (Ex. 100: K. Brugnara Depo. Tr., 147:15-149:2; Ex. 111: BPVI 30(b)(6) Depo. Tr., 121:4-123:24.)

EXHIBIT A JOINT STATEMENT OF FACTS

158. The PSG loan also provided funds to Kay to settle the IGL Judgment (discussed above) and pay for "deferred maintenance" at SeaCliff. (Ex. 100: K. Brugnara Depo. Tr., 187:3-8, 107:24-25, 109:22-24.)

159. In December 2016, Kay caused BPVI to pledge SeaCliff as collateral for a $300,000 loan from California Home Loans. (Ex. 30: Deed of Trust, BPVI to California Home Loans.)

160. SeaCliff's mortgage payments, property taxes, and property insurance bills have all been paid using cash from refinances. (*See* Ex. 101: L. Brugnara Depo. Tr., 66:16-22; 121:3-20; 147:14-19; Ex. 100: K. Brugnara Depo. Tr. 66:8-15, 68:21-69:6; Ex. 111: BPVI 30(b)(6) Depo. Tr., 96:16-97:12, 103:17-18.)

**C.    Luke and Kay have comingled their own personal finances with BPVI's finances.**

161. Luke and Kay claim that they pay SeaCliff's water, electricity, gas, and waste collection bills using cash from SeaCliff's refinances, and sometimes their own personal funds. (Ex. 111: BPVI 30(b)(6) Depo. Tr., 124:13-24.)

162. Kay and Luke claim they have contributed their personal funds ("cash infusions") towards the operation and maintenance of SeaCliff. (*Id.*, 48:23-52:18; *see also* Ex. 65: BPVI's Plan of Reorganization dated August 16, 2017, Current Bankruptcy Case, Dkt. No. 45, pp. 2, 4.)

163. Kay has not kept track of how much of her personal funds she has contributed toward the operation and maintenance of SeaCliff. (*See id.*)

164. On May 4, 2011, Luke declared, "I will inject/infuse/advance any funds (if any are required) to Kay Brugnara to pay any expenses of BPVI upon her request/demand." (Ex. 81: Declaration of Luke Brugnara dated May 4, 2011 ("2011 Decl. of L. Brugnara") (attached to Supplemental Declaration of Kay Brugnara, 2010 Bankruptcy Case, Dkt. No. 61), ¶¶ 4-5.)

165. As recently as March 2018, the Brugnaras' son, Luke II, has offered to sell what he claims to be a genuine Andy Warhol painting worth millions of dollars, and lend Kay $6.5 million so she can "inject" cash into BPVI. (Ex. 67: Declaration of Luke Brugnara II, Current Bankruptcy Case, Dkt. No. 149, ¶¶ 4, 5; *see also* Kay Brugnara, Opposition to Conversion to Chapter 7, Current Bankruptcy Case, Dkt. No. 147.)

30

Case: 17-03071    Doc# 91    Filed: 07/20/19    Entered: 07/22/19 11:58:45    Page 54 of 58

### D. Kay decides when and how to maintain SeaCliff.

166. Kay claims she "deferred" the repair and maintenance of extensive water damage at SeaCliff resulting from leaks initiating from the roof, the decks, and the elevator shaft that she noticed in 2011 until late 2016. (Ex. 100: K. Brugnara Depo. Tr., 244:4-245:3; 248:21-249:20.)

167. Kay decided to delay this maintenance because she, personally, did not have sufficient funds to fix the repairs on the house. (Ex. 100: K. Brugnara Depo. Tr., 247:8-248:11.)

168. In 2016, Kay decided the details of the renovation work at SeaCliff, including choosing the kitchen cabinets and countertops and the paint color throughout the house. (*See* Ex. 111: BPVI 30(b)(6) Depo. Tr., 90:18-91:7.)

### E. Kay purposely misled a lender in connection with SeaCliff's 2016 maintenance and renovation.

169. In 2016, Kay caused BPVI to pledge SeaCliff as collateral for a $1.5 million loan from PSG. (Ex. 29: Deed of Trust, BPVI to PSG.) The PSG loan provided $167,000 for repairs to SeaCliff. (Ex. 100: K. Brugnara Depo. Tr., 75:18-76:6; 187:3-25; Ex. 111: BPVI 30(b)(6) Depo. Tr., 95:10-96:3.) The PSG loan required that the funds for the SeaCliff renovation be paid directly to the contractor. (Ex. 100: K. Brugnara Depo. Tr., 187:3-25.)

170. To complete the repairs paid for by the PSG loan, Kay requested proposals from Matthew Huey of MH Construction to "clean up the house and fix it for sale." (Ex. 104: Huey Depo. Tr., 28:21-29:1; 37:22-38:5; Ex. 111: BPVI 30(b)(6) Depo. Tr., 175:5-11, 176:16-177:7; Ex. 105: Email chain from Kay to Matthew Huey, dated February 29, 2016.) The work at SeaCliff consisted of extensive repairs of water-damaged areas throughout the house and the roof. (Ex. 111: BPVI 30(b)(6) Depo. Tr., 82:22-84:18; Ex. 100: K. Brugnara Depo. Tr., 75:18-76:1.)

171. On February 29, 2016, Kay sent an email to Huey requesting a written estimate for a list of repairs and renovations she wished to have completed at SeaCliff. (Ex. 111: BPVI 30(b)(6) Depo. Tr., 176:16-177:7; Ex. 105: Email from Kay to Matthew Huey, dated February 29, 2016.) Kay's itemized list included "New Kitchen Cabinets (cherry wood)," "New hardwood floor on entire first floor," and "$15,000 for Kay." (*Id.*) Minutes later, Kay sent a second email to Huey, asking him to also include "[n]ew granite countertop and sink" for the kitchen. (*Id.*)

EXHIBIT A JOINT STATEMENT OF FACTS

172. On March 2, 2016, Huey submitted a written proposal to Kay for $82,000, for the work requested by Kay on February 29, 2016. (Ex. 104: Huey Depo. Tr., 22:12-25; 37:22-38:5; 39:20-40:4; Ex. 106: Written Proposal by MH Construction to Kay, dated March 2, 2016)

173. On March 28, 2016, Kay sent another email to Huey asking him to scale back the "proposed work" to reflect her revised itemized list of repairs (Ex. 111, BPVI 30(b)(6) Depo. Tr., 178:23-179:10; Ex. 107: Email from Kay to Matthew Huey, dated March 28, 2016.) Kay asked Huey to complete the revised list of repairs for $45,000 but to submit a written proposal for $60,000. (*See id.*) Kay stated that she needed the additional "$15,000 for BPVI operating expenses however this cannot be mentioned in bid to lender." (*Id.*)

174. On April 5, 2016, Huey submitted a revised written proposal to Kay for $60,800. (Ex. 104: Huey Depo. Tr., 22:12-25; 40:9-12; Ex. 108: Written Proposal by MH Construction to Kay, dated April 6, 2016.)

175. On December 6, 2016, Kay signed a $167,500 Proposal and Contract with MH Construction for "repairs" at SeaCliff. (Ex. 104: Huey Depo. Tr., 46:9-47:6; Ex. 109: Proposal and Contract with MH Construction, dated December 6, 2016.) The final contract price of $167,500, included items from Kay's lists and a few additional items. (Ex. 104: Huey Depo. Tr., 22:12-25; 25:13-26:12; 30:2-13; 37:22-39:6; 52:20-24; 56:8-13; Ex. 109: Proposal and Contract with MH Construction, dated December 6, 2016.)

176. On February 1, 2017, MH Construction submitted an Application and Certificate for Payment to Kay which included the "Original Contract Sum" of $167,500, consistent with the December 2016 Proposal and Contract. (Ex. 104: Huey Depo. Tr., 22:12-25; Ex. 110: Application and Certificate for Payment, dated February 2, 2017.)

**177. The final MH Construction Proposal and Contract included $25,000 that Huey ultimately rebated to Kay without PSG's knowledge. (Ex. 111: BPVI 30(b)(6) Depo. Tr., 185:7-186:14; see also Ex. 104: Huey Depo. Tr., 36:3-37:19; Ex. 120: JPMC2 Documents, Bates Nos. JPMC2_0108-109.)**

32

**F.    Luke and Kay both claim that their compensation for being an officer of BPVI is equivalent to the rent for SeaCliff.**

178.    In 2015, Luke claimed that he receives compensation from BPVI in the form of rent credit at SeaCliff. (Ex. 75: 2015 Decl. of Luke Brugnara, ¶ 10.)

179.    Kay also claims that she receives compensation from BPVI in the form of rent credit at SeaCliff. (Ex. 60: May 11, 2018 Decl. of K. Brugnara, ¶¶ 1, 4, 6, 7.)

180.    Since 2012, neither Luke nor Kay has reported any compensation from BPVI on a federal tax return. (Exs. 135 – 140: Certified IRS Transcripts for Luke Brugnara for tax years 2012-2017; Exs. 145 – 150: Certified IRS Transcripts for Kay Brugnara for tax years 2012-2017; *see also* Ex. 100: K. Brugnara Depo. Tr., 109:10-12.)

181.    BPVI has not reported any compensation or salary payments on any federal tax return. (Ex. 112: RFAs & Responses, Request and Response Nos. 79-84, 104-110 referencing Attachments I-N (Exs. 151 – 156: BPVI's Forms 1120 for tax years 2005-2010); Exs. 157 – 159: BPVI's Forms 1120 for tax years 2012, 2013, 2016.)

182.    BPVI did not report any officer compensation or executory contracts when it filed for bankruptcy in 2009, 2010, 2014, and 2017. (*See* above ¶¶ 81, 83, 86, 87, 89, 92.)

183.    Other than the January 2, 2010 Corporate Resolution written and signed by Luke and Kay, granting Kay rent-credit at SeaCliff, for 20 years, in lieu of a $200,000 annual compensation as BPVI's sole officer, there is no lease agreement, purported or actual, between BPVI and either Kay or Luke. (Ex. 111: BPVI 30(b)(6) Depo. Tr., 72:1-73:20; Ex. 112: RFAs & Responses, Request and Response No. 32; Ex. 113: USA's Rogs, Interrogatory No. 1; and BPVI's Responses to USA's Rogs, Response to Interrogatory No. 1, referencing USA's RFA No. 32; Ex. 116: January 2, 2010 Corporate Resolution.)

184.    Kay believes a fair rental value for SeaCliff is in the range of $15,000-$20,000 per month. (Ex. 111: BPVI 30(b)(6) Depo. Tr., 74:19-74:24.)

185.    Kay has never paid BPVI any actual "rent" for living at SeaCliff. (Ex. 111: BPVI 30(b)(6) Depo. Tr., 73:21-74:19.)

33

EXHIBIT A JOINT STATEMENT OF FACTS

| | |
|---|---|
| 1 | Dated: March 28, 2019 |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | Dated: March 28, 2019 |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |

Dated: March 28, 2019                          Respectfully Submitted,

XAVIER BECERRA
Attorney General of California
KAREN W. YIU
Supervising Deputy Attorney General

/s/ Cara M. Porter
CARA M. PORTER
Deputy Attorney General
*Attorneys for California Franchise Tax Board*

Dated: March 28, 2019                          DAVID L. ANDERSON
United States Attorney

/s/ Mahana K. Weidler
MAHANA K. WEIDLER
Trial Attorney, Tax Division
*Attorneys for the United States of America*

SF2017901699
21403666 docx

34